747 A.2d 634

Michael Anthony THROWER

v.

STATE of Maryland ex rel. BUREAU
OF SUPPORT ENFORCEMENT.

Michael A. Mason, Sr.

v.

State of Maryland ex rel. Bureau of Support Enforcement.

Leonard Jerome Miles, Jr.

v.

St. Mary's County Department of Social Services, et al.

No. 116, Sept. Term, 1999.

Court of Appeals of Maryland.

March 8, 2000.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioners.

Joseph B. Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, WILNER, CATHELL, HARRELL and THEODORE G. BLOOM (retired, specially assigned), JJ.

WILNER, Judge.

Michael Thrower, Michael Mason, and Leonard Miles, who were each in substantial arrears in the payment of court-ordered child support, were charged in the Circuit Court for St. Mary's County with constructive civil contempt of court for failure to maintain bi-weekly contact with the State Bureau of Support Enforcement (BOSE), as previously ordered by the court. Acting pursuant to Maryland Rule 9–207(a)(1)(G), the petitions were referred by the clerk to a domestic relations master for the taking of testimony and the making of findings and recommendations. The hearings conducted by the master in each of the three cases were, at best, summary in nature. The respondents appeared without counsel and without a proper waiver of counsel.

After finding, in each case, that the respondent had willfully failed to maintain the required contact with BOSE and was therefore in contempt, the master recommended that the respondent be incarcerated for 179 days unless a purge amount that had utterly no evidentiary foundation but which the master found the respondent had the ability to pay, was paid within a set period of time. The appeals now before us are from judgments of the court adopting those findings and implementing the recommendations.

Appellants insist that the orders entered against them must be reversed for any of four reasons: (1) there was not an effective waiver of counsel, (2) there was insufficient evidence to support the purge amount, (3) referral of a constructive civil contempt proceeding to a master pursuant to Rule 9–207 violates due process and constitutes an improper delegation of judicial authority, in violation of Article IV, § 1 of the Maryland Constitution, when incarceration is imposed, and (4) the procedures set forth in Maryland Rule 15–207(e) for the conduct of civil contempt support enforcement actions violate due process and Article IV, § 18 of the Maryland Constitu-

tion.[1]  The State concedes the validity of the first and second reasons and acquiesces in reversals on those grounds.  It urges that we not address the other two arguments on the grounds that, one, they were not raised in or decided by the circuit court and therefore have not been preserved for appellate review, and two, this Court ordinarily does not address State or Federal Constitutional issues if it is not necessary to do so.  We agree that the judgments must be reversed on the second ground raised by appellants and thus find it unnecessary to address the other grounds.[2]

---

**1.**  The case was argued before us as though the finding of contempt was based on the willful failure to pay the court-ordered child support.  In fact, as noted, the contempt that was charged was the failure to maintain bi-weekly contact with BOSE.  Appellants do not question in this appeal whether it is permissible for a court to order that a sum of money be paid as a purge of that form of contempt, so we shall not address that issue.

**2.**  The third and fourth grounds raised by appellants are Constitutionally based.  We have generally followed the principle that we will not reach a Constitutional issue when a case can properly be disposed of on a non-Constitutional ground.  *Secretary, Dept. of Public Safety and Correctional Services v. Henderson,* 351 Md. 438, 451, 718 A.2d 1150, 1156 (1998); *Professional Staff Nurses Ass'n v. Dimensions Health Corp.,* 346 Md. 132, 138, 695 A.2d 158, 161 (1997); *State v. Lancaster,* 332 Md. 385, 403–04 n. 13, 631 A.2d 453, 463 n. 13 (1993).

The first issue, regarding counsel, is an important one, but as presented, it hinges almost entirely on the convergence of (1) the practice, authorized by Rule 9–207(a)(1)(G), of referring constructive civil contempt cases to masters for hearing and the making of proposed findings and recommendations, and (2) a policy decision by the Public Defender, apparently based on a lack of funding, not to provide representation for indigent respondents charged with constructive civil contempt in proceedings before a master.  *See* letter of Stephen E. Harris, Public Defender, February 9, 2000, to this Court, commenting on amendments to Maryland Rule 9–207 proposed in 147th Report of this Court's Standing Committee on Rules of Practice and Procedure.  Maryland Rule 15–206(c) provides that, upon the filing of a petition not found to be facially frivolous, the court must enter an order stating the time for an answer, the time and place the respondent must appear in person for a hearing, and, if incarceration is sought, specific notice, in the form set forth in the Rule, of the respondent's right to counsel.  Among the statements required to be included in the order is the advice that "[i]f you want a lawyer but do not have the money to hire one, the Public Defender may provide a lawyer for you.  You must contact the Public

Defender at least 10 business days before the date of the hearing. The court clerk will tell you how to contact the Public Defender."

That advice, directing an indigent respondent to the Public Defender, follows from the statutory obligation of the Public Defender to provide representation for indigent parties or defendants in "[a]ny ... proceeding where possible incarceration pursuant to a judicial commitment of individuals in institutions of a public or private nature may result." Article 27A, § 4(b)(4). The Public Defender's policy of declining to provide representation to indigent respondents when appearing before masters is based on the theory that, as a master is not authorized to order incarceration, but may only recommend that sanction, a proceeding before a master is not one from which "possible incarceration pursuant to a *judicial* commitment ... may result." The Public Defender will, apparently, file exceptions on behalf of an indigent person whom a master has recommended be incarcerated and will represent that person on the exceptions before the court, but at the master's level, the person is on his or her own insofar as the Public Defender is concerned.

This policy, of course, makes the advice required by Rule 15–206(c) confusing at best and exasperating at worst when the matter is referred to a master. Rule 15–206(e), applicable when incarceration is sought, provides that, if a respondent appears in court pursuant to the order without counsel, the court must conduct a waiver inquiry. If the person indicates a desire to have counsel and the court finds that he or she received a copy of the order containing the notice described above, the court must permit the person to explain the appearance without counsel. In the case of an indigent person, the explanation is likely to be that the Public Defender was contacted and that he declined representation. Rule 15–206(e)(2)(C) then requires the court to determine whether there is a meritorious reason for the appearance without counsel. It continues:

"If the court finds that there is a meritorious reason for the alleged contemnor's appearance without counsel, the court shall continue the action to a later time and advise the alleged contemnor that if counsel does not enter an appearance by that time, the action will proceed with the alleged contemnor unrepresented by counsel. If the court finds that there is no meritorious reason for the alleged contemnor's appearance without counsel, the court may determine that the alleged contemnor has waived counsel by failing or refusing to obtain counsel and may proceed with the hearing."

This entire scheme founders, of course, on the Public Defender's policy of not representing indigent respondents in proceedings before a master. If an indigent person contacts the Public Defender, as directed by the court, and is declined representation, his or her appearance without counsel must be regarded as meritorious. The only effect, however, is to require a postponement, but to no practical purpose. When the person appears again without counsel, the same situation will be presented. There will never be a valid waiver, and there will never be counsel, unless an attorney is appointed by the court, which has no funds to pay that attorney, to provide the representation that the Public Defender should provide.

## THE FACTS

### Michael Thrower

Michael Thrower fathered four children by three different women, each of whom was compelled to pursue him for child support. On February 9, 1990, at the instance of Bertha Brown, Thrower was ordered to pay to BOSE $200 a month for the support of his son, Michael Thrower, Jr. In June, 1991, at the instance of Sebastine Corbin, a consent order was entered directing him to pay to BOSE $75 a month for the support of his son, Michael Thrower III. In October, 1991, by consent, that amount was increased to $76 per week. Also in October, 1991, a judgment divorcing him from Cynthia Thrower ordered him to pay to Ms. Thrower $200 a month for the support of Shatie and Tanika Thrower, children of that marriage.

These various support orders had little effect on Mr. Thrower. In April, 1991, he was already $965 in arrears as to Michael, Jr. In December, he was $3,260 in arrears as to Michael III, and, in that month, he was found in contempt and ordered committed to jail unless $500 was paid on the arrear-

---

This dilemma can be resolved only if the Public Defender changes his policy of not representing indigent respondents in proceedings before masters or this Court changes the rule allowing the referral of constructive civil contempt cases in which incarceration is sought to masters for hearing, findings, and recommendations, subject to court review only on exceptions and on the record made before the master. Although we question the Public Defender's policy, and the asserted basis for it, the fact is that, whether or not Constitutionally mandated, as a matter of sound judicial policy, incarceration should be ordered only by a judge on a record developed before the judge. The authority to refer such cases to masters with court review on the record made before the master was adopted before the creation of Family Divisions in the metropolitan circuit courts and before the rural circuit courts had domestic relations masters, and, *in its present form*, it has outlived its usefulness. The Court has currently pending before it, in the 147th Report of its Standing Committee on Rules of Practice and Procedure, a proposal to amend Rule 9–207, which we anticipate acting upon shortly. The solution to the first issue raised by appellants, therefore, can be addressed through a change in the rule. Thus, notwithstanding the State's concession on the first issue, we need not resolve this case on that basis. It is unnecessary to do so.

age. In June, 1992, he was $8,836 in arrears as to Shatie and Tanika and was again ordered committed, for 90 days, unless $500 was paid. His total support obligation at that time was $789/month. In March, 1993, he was $15,864 in arrears as to Shatie and Tanika. In lieu of incarceration, he was ordered then to make bi-weekly contact with BOSE for employment counseling and monitoring. Whatever emanated from that contact seemed to work, at least for a while, for the next enforcement action was not until November, 1996, at which time his arrearage had climbed back to $15,986. He was again ordered to report his employment status to BOSE on a bi-weekly basis and to submit a medical incapacitation form.

In August, 1997, when he was nearly $16,000 in arrears as to Michael, Jr., over $23,000 in arrears as to Michael III, and over $18,000 in arrears as to Shatie and Tanika, Thrower filed a petition to reduce the amount of support for Shatie, Tanika, and Michael III on the ground that a "recurring injury of my knee from 1991, keep stopping me from working." In December, 1997, a consent order was entered establishing a wage lien and directing Thrower to pay $270/month for Shatie and Tanika, an *increase* of $70/month. The next effort to secure payment came in November, 1998, when Thrower was alleged to be about $70,000 in arrears in the three cases. At a hearing before the master, Thrower claimed to be employed, making about $140/week. His defense at the time was that money was being withheld pursuant to the earnings lien, but he produced no records to demonstrate any such deduction and BOSE claimed that it had received nothing from the employer. The master, on no evidence other than Thrower's admission that he was earning about $140/week, found that he had "the present ability to make his full on-going child support payments and maintain bi-weekly contact with [BOSE]" and that he also had "the present ability to meet [a] purge amount of [$420]." He recommended that Thrower be held in contempt for failure to pay and failure to maintain bi-weekly contact with BOSE, that a purge amount of $420 be set, and that Thrower be incarcerated for 179 days, on a work-release program, if the purge amount was not paid within three

weeks.[3] Expressing his obvious frustration, the master told Thrower: "I can't deal with you any more. You owe seventy thousand dollars. You don't care. You're not sincere about child support or anything else. You just come in here and blow your smoke and your story and I'm just done with you."

Exceptions to the master's recommendations were filed by the Public Defender's Office, claiming that (1) there was no evidence supporting the master's finding that Thrower had the present ability to pay the purge amount, (2) the master failed to determine whether Thrower had received notice of his right to counsel, as required by Maryland Rule 15–206(e) and Thrower was not permitted to explain his appearance without counsel, and (3) Thrower was not given a fair opportunity to offer a defense. In January, 1999, the court found that the master had neglected to advise Thrower of his right to counsel and sustained that exception. Thrower, who apparently had been incarcerated in the meanwhile, was released from jail.

Two months later, in March, 1999, another petition for contempt was filed, charging Thrower with failure to maintain bi-weekly contact with BOSE, as required by the existing court order. Thrower failed to appear at the hearing set for March 12. When he appeared at the rescheduled hearing on May 14, he requested, and received, a postponement in order to obtain counsel. He requested, and received, the same relief at a hearing on June 28. The hearing that ultimately led to this appeal was held on July 19, 1999. It did not take very long.

Thrower again appeared without counsel. After the master was advised by BOSE that Thrower had "been given a double opportunity to obtain an attorney," this colloquy, which constitutes the entire waiver inquiry, occurred:

---

**3.** The effect of setting a purge amount of $420 and directing that it be paid within three weeks was to require Thrower to pay, as child support, his entire earnings for three weeks. Whether the $140/week he said he made represented gross or net income is not clear, and the master made no finding with regard to it.

"THE COURT: Okay. So you've had the opportunity. You're here without a lawyer. You're ready to go. You gonna be your own lawyer"

MR. THROWER: Yes.

THE COURT: Okay. Very good. Court finds pursuant to Maryland Rule [15–206] that Mr. Thrower has knowingly and voluntarily waived his right to counsel. Swear him in."

The BOSE agent, who was not sworn, informed the court that Thrower was then $76,359 in arrears and that his last contact with BOSE was on July 16—only three days earlier. BOSE later acknowledged that, as the result of a consent order agreed to by one of the mothers but not yet signed by a judge, $20,000 of the arrearage would be excused, leaving a remaining arrearage of approximately $56,000. His total support obligation was then $814/month and the only payment received by BOSE in 1999 was $180.35, which was pursuant to a wage lien. Thrower stated that he had been fired from his job and was then receiving unemployment benefits of $69/ week. He said that he had two of his children with him during the summer.

On that evidence, the master decided to double the $420 purge he had set in 1998, declaring: "The purge in this case will be eight forty and you can get the Public Defender and file an exception and I'm sure you'll be successful in having that one overturned too. No problem." Because Thrower had the two children with him, the master decided to delay the "purge date" until August 30. The actual findings made by the master were that Thrower was in contempt of court, that $840 was a reasonable purge amount, and that Thrower had the present ability to pay that amount. How he was going to pay it when his only apparent resource was unemployment benefits of $69/week was not discussed by the master. The master recommended that, unless the $840 was sooner paid, Thrower be incarcerated for 179 days, effective September 15, 1999, but placed on work release. The same exceptions that had been filed with respect to the 1998 report of the master were filed to this report, in nearly identical language, the first

one being that there was no evidence to support the master's conclusion that Thrower had the present ability to pay the purge amount. The court denied the exceptions, however, and, in an order dated July 30, 1999, adjudged Thrower to be in contempt of court and sentenced him to 179 days in the county detention center, effective September 15, 1999, unless before then he paid a purge amount of $840.

### Michael Mason

In a paternity action filed in 1985, Michael Mason was found to be the father of Katrina Thomas, born on January 31, 1982, and he was ordered to pay support for that child. In a paternity action filed in 1986, he was found to be the father of Michael Mason, Jr., born on March 2, 1982—two months after Katrina—and was ordered to pay support for him. In each case, the amount of support was eventually set at $250/month, payable to BOSE.

Mason was first found in contempt for failing to support his son, Michael, in September, 1987. By September, 1988, his arrearage in Michael's case had risen to $2,250, and he was again found in contempt. A third contempt order came in March, 1992, by which time his arrearage had declined to $1,459. The arrearage increased thereafter until May, 1996, when Michael's mother agreed to forgive nearly $7,500 in accumulated arrearage. By September, his arrearage was back to $1,700.

A similar pattern occurred in Katrina's case, resulting in several contempt proceedings. At some point, the two support orders were enforced together, and the consolidated arrearage grew significantly. By July, 1999, even after the forgiveness of $7,500, his combined arrearage stood at over $12,000. In that month, BOSE petitioned for contempt, not on the basis of non-payment, but because Mason had failed to maintain bi-weekly contact, as required. Mason appeared at the hearing without a lawyer. The waiver inquiry consumed all of eleven lines on one page of transcript:

"THE COURT: Alright. You have the right to have a lawyer, you know that.

MR. MASON: Yes, sir.

THE COURT: You've been here before.

MR. MASON: Yes.

THE COURT: You going to be your own lawyer today?

MR. MASON: Yes.

THE COURT: Alright. The Court finds pursuant to Maryland Rule [15–206] that Mr. Mason has knowingly and voluntarily waived his right to counsel. And you understand the outcome of the proceedings could be jail and a lawyer could be helpful to prevent that?

MR. MASON: Yes."

At that point, BOSE informed the master that there were *three* cases pending, requiring bi-weekly contact, that Mason's last contact with BOSE was March 8, 1999, and that the last payment was a purge amount of $300 paid on March 30. When asked about the lack of contact, Mason said that he had "a little drinking problem" and had gone to a Veterans Administration hospital to "dry out." He had no clear recollection of when he went to the hospital but said that he stayed there for two weeks. Mason said that he was unemployed but made about $75/week doing odd jobs. On that evidence, the master found that (1) there was no justifiable excuse for missing eight of the required contacts with BOSE, (2) Mason was not regularly employed but earned $75 from odd jobs, (3) he had the present ability to make bi-weekly contacts and to pay child support, (4) the outstanding arrearage was $12,095, (5) a reasonable purge was $900, and (6) Mason had the present ability to pay that amount. Upon those findings, the master recommended that Mason serve 179 days in the county detention center, unless he paid the purge amount before August 9, 1999.

The Public Defender filed exceptions, complaining that there was no evidence to support the purge amount, the master failed to conduct a proper waiver inquiry, and Mason was not given a fair opportunity to defend himself. They were denied by the court which, instead, entered an order implementing the master's recommendations.

### Leonard Miles

In a paternity order filed in May, 1994, Miles was found to be the father of Litiona Miles, born to Cheryl Nelson, and ordered to pay $100/month support. By September, 1997, he was $2,900—nearly 2½ years—in arrears. In February, 1998, he was found in contempt because of a failure to cooperate with BOSE by providing job contacts—evidence of attempts to obtain employment. In August, 1998, October, 1998, and March, 1999, he was again found in contempt, for failing to maintain bi-weekly contact with BOSE. In March, the master found that Miles, 25 years old, lived with and was supported almost entirely by his mother, that he had voluntarily impoverished himself, and that he was capable of earning $400/week. His arrearage at the time was over $3,300. The court sentenced him to 179 days incarceration unless he paid a purge amount of $1,200 by April 19. He did not make the payment and was incarcerated until May 6, 1999.

In a paternity order filed in March, 1999, he was found to be the father of Emontraz Miles, born to Constance Wade, and ordered to pay $150/month support for him and to cooperate with BOSE.

In June, 1999, a petition was filed to hold Miles in contempt for failure to maintain bi-weekly contact with BOSE, as ordered. He appeared at the hearing before the master without counsel. The following colloquy comprises the entire waiver inquiry:

"THE COURT: Alright, Mr. Miles, you certainly know you have the right to have a lawyer. You've been here many times. You gonna be your own lawyer today?

MR. MILES: Yeah.

THE COURT: Alright. Court finds pursuant to Maryland Rule [15–206] the Defendant has knowingly and voluntarily waived his right to counsel. You understand you can go to jail?

MR. MILES: Yeah.

THE COURT: Knowing all that, you gonna be your own lawyer? You know a lawyer could be helpful? Any you're

still unemployed? And basically, you are a confirmed unemployed person? Yes, you are. You're—you're not going to work. Whatever you do to make money, you—you do it your way"

Having launched into that attack, the master never got an answer to his final inquiry regarding counsel. The master elicited from Miles that he continued to be supported by his mother, who gave him about $100 a month. The master noted that Miles was wearing some jewelry, which Miles said his father had given him for his birthday. He said he did not know its value. When pressed, Miles said he thought the jewelry was worth about $80. On this evidence, the master made the following findings:

"Court finds that the Defendant has voluntarily impoverished himself. That he refuses to get a job. That he's appeared in Court on numerous occasions and fails to work. Court finds that the Defendant lives with his mother who supports him. That the only assets he has are miscellaneous items of what appear to be gold jewelry that he is wearing proudly and prominently in Court. Court finds the outstanding arrearage in this case to be four thousand, one hundred and ninety dollars and seventy six cents. *Court takes judicial knowledge that the gold jewelry appears to be worth four thousand, one hundred and ninety dollars and seventy six cents.* Court's gonna find you in contempt of Court. Finds that you have the present ability to pay your child support. Gonna set your purge at four thousand, one hundred and ninety dollars and seventy-six cents and finds that you have the present ability to meet that purge. You can sell your jewelry. That's up to you."

(Emphasis added).

When Miles protested that the jewelry was not worth anything near $4,000, that "I can't pay no four thousand dollars and you know that your own self," the master responded, astonishingly (and erroneously):

"Well, here's the good news. Once we found you in contempt and you can't pay, you'll spend your six months in jail

and you'll never have to worry about that past four thousand dollars. It will only be the new money. So I'm really trying to help you. You don't realize that, but if you went to a lawyer, they'd tell you. Yeah, actually he's helping you. 'Cause see, once you're found in contempt of Court and you meet your—you either serve your time or pay your purge, you're clean. You're ready to go. It's only new stuff. So I'm cleaning you up."

In conformance with those pronouncements, the master recommended that Miles be incarcerated for 179 days unless he paid the purge amount of $4,190.76 by August 9, 1999— three weeks hence. The same exceptions filed in the other cases were filed to this report, and, as in the other cases, they were denied by the court.

## DISCUSSION

In *Carroll County v. Edelmann*, 320 Md. 150, 577 A.2d 14 (1990), we noted that parenthood is both a biological and a legal status, that by nature and law it confers rights and imposes duties, and that one of the duties it casts upon parents is the duty to support their children until the law determines that the children are capable of self-support. We quoted, with approval, the eloquent statement by Blackstone published more than 200 years earlier:

"The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation ... laid on them not only by nature herself, but by their own proper act, in bringing them into the world; for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved."

*Edelmann* at 170, 577 A.2d at 24, (quoting 1 WILLIAM BLACK-STONE, COMMENTARIES * 447) (emphasis in original).

We pointed out that the duty of support, in Maryland, is more than a principle of natural law and a voluntary undertaking. It is also a statutory obligation. Maryland Code, § 5–203 of the Family Law Article declares parents to be the natural guardians of their minor children, jointly responsible for the children's support, and § 10–203 of that Article makes it a misdemeanor for a parent willfully to fail to provide that support.

Enforcement of that obligation, when enforcement is required, has never been easy. It is a significant problem that has plagued the nation and this State for many years. Studies have been conducted, volumes have been written, and laws have been enacted by both Congress and the State legislatures. Efforts to induce compliance are multi-faceted, ranging from employment counseling and other programs designed to assist in voluntary compliance, to a variety of intermediate coercive techniques, including wage liens, the interception of tax refunds and other governmental payments, and the suspension of various licenses and privileges, to the ultimate and most traditional device of threatening or actually imposing incarceration, either through ordinary criminal proceedings or, when the duty of support has been formalized in a court order, through criminal or civil contempt proceedings. The ultimate objective of all of these efforts and techniques, including those that are truly punitive in nature, is not to punish the parent but to provide support for the children.

Although incarceration for non-support—the ultimate permissible sanction—does not constitute imprisonment for debt (Maryland Constitution, Article III, § 38; *Johnson v. Johnson*, 241 Md. 416, 419, 216 A.2d 914, 916 (1966)), it obviously impinges upon the liberty interest that parents have under the Fourteenth Amendment to the U.S. Constitution, under the Maryland Constitution, and under Maryland common law, and thus must comport with both procedural due process and with the non-Constitutional procedures ordained by this Court. As these cases, and many others that preceded them, illustrate, it may be frustrating to judges and masters to

have to deal with people who appear to be deliberately ignoring their child-support obligations, by spending available funds for other purposes, by voluntary impoverishment, by refusing to obtain steady employment, or by other techniques—people who return time and again with excuses that the judge or master finds incredible or inadequate and who thus seem to flaunt their defiance of properly entered court orders. Nonetheless, because a person's liberty is at stake and because it is a judicial proceeding, both the form and substance of due process and proper judicial procedure must be observed. Shortcuts that trample on these requisites and conclusions that are based on hunch rather than on evidence are not allowed.

■ These cases, hopefully, represent the worst in disregard for proper, mandated procedure. Apart from the farce that passed for a waiver inquiry, and apart from the fact that the contempt charge in all three cases was based on failure to maintain contact with BOSE rather than on non-payment of support, the purge amounts recommended by the master, and approved by the court, were conjured up out of nothing. There was not a scintilla of evidence to support a conclusion that Thrower, Mason, or Miles then had or could possibly obtain the ability to pay the purge amounts within the time set, in order to avoid incarceration. It defies any semblance of logic or human experience to suppose that, on $69/week unemployment benefits and with no other significant assets, Thrower would be able to pay $840 within a month or that on $75/week, Mason would be able to pay $900 in three weeks. And for the master to take *judicial notice* that jewelry worn by Miles, who had no other assets and no employment, and who was being supported entirely by his mother, was worth $4,190.76, is so far removed from reality as to suggest an actual disdain for proper judicial procedure and temperament.

JUDGMENTS REVERSED; ST. MARY'S COUNTY TO PAY THE COSTS.