780 A.2d 1180

Reno Edward LACY, Sr.

v.

Laura Maureen ARVIN.

No. 1498, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 10, 2001.

414

Monica L. Scherer (Silverman & Thompson, on the brief), Baltimore, for appellant.

Joseph Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Mary C. Murphy, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER, and JAMES S. GETTY (Ret'd, specially assigned), JJ.

DEBORAH S. EYLER, Judge.

In this case, we must determine whether a contractual agreement between separated parents by which the non-custodial parent pays child support without the compulsion of a court order can be a "preexisting reasonable child support obligation," under Md.Code (1984, 1999 Repl.Vol., 2000 Supp.) section 12–201(d)(1) of the Family Law Article ("FL"), so as to be subtracted from the paying parent's actual income in calculating a child support award for another of his children, by a different mother. We conclude that it can be.

In the Circuit Court for Baltimore County, Laura Maureen Arvin, the appellee, sued Reno Edward Lacy, Sr., the appellant, to establish paternity and for child support. After the parties stipulated to paternity, the child support issues were tried by the court. From an amended order establishing paternity and awarding child support, Lacy appeals, presenting four questions for review, which we have reworded:

I. Did the trial court err in failing to incorporate the appellant's preexisting reasonable child support obligations in calculating child support under the guidelines?

II. Did the trial court abuse its discretion in failing to deviate downward from the child support guidelines?

III. Did the trial court err by including in the child support award a day care expense that the appellee was not actually incurring at the time of trial?

IV. Did the trial court err in calculating child support by failing to credit the appellant for the health insurance expense of the minor child?

## FACTS AND PROCEEDINGS

In March of 1994, Arvin and Lacy had a brief relationship. Nine months later, on December 21, 1994, Robin Nicolette Lacy, the child in this case, was born.

On May 24, 2000, when Robin was five years old, Arvin brought suit against Lacy in the Circuit Court for Baltimore County, to establish paternity and for child support. The parties consented to genetic testing, which showed that there was a 99.99% likelihood that Lacy was Robin's biological father.

Trial commenced on July 24, 2000. At the outset of the proceedings, the parties stipulated to paternity and to their gross monthly incomes. The court then took testimony from Lacy, Arvin, and two witnesses called by Lacy.

Arvin testified that her work schedule necessitates day care services for Robin from Monday through Saturday morning. At the time of trial, she was paying a relative who is not a licensed day care provider $90 per week to watch Robin. She previously had been paying for Robin to attend a licensed day care program called Open Door. She had to remove Robin from that program when the school year ended, however, because the program's fee had increased to $110 per week for the summer and she already was behind in her payments to the facility. Arvin explained that if she had kept Robin at Open Door, which operates Monday through Friday, she still would have had to employ her relative on Saturdays, at a rate of $20, and her total day care expense thus would have been $130 per week. Arvin further testified that if she were awarded child support, she would re-enroll Robin at Open Door.

Lacy testified that he is married to Catherine Lacy, but they have been separated since 1994. He and Catherine have three minor children who are older than Robin and who live with their mother.[1]  Ever since he and Catherine separated, Lacy has been paying Catherine $400 every other week for support for the children. The sum is paid in cash, which Lacy withdraws from an ATM machine after depositing his paycheck.  According to Lacy, he and Catherine agreed to the $400 figure because that is the amount that Catherine estimated was necessary to pay her bills. There is no court order directing Lacy to pay that sum or any sum in child support for his three children with Catherine.

Lacy further testified that he and a woman named Dawn M. Griffin Hess have a minor child for whom he pays support of $100, every other week. He also makes that payment in cash, after withdrawing the sum from an ATM machine. Lacy has been paying child support to Dawn every other week for 11 years. There also is no court order directing Lacy to pay the $100 bi-weekly sum, or any sum, for child support for that child.

Catherine corroborated Lacy's testimony about his child support payments to her. She stated that she and Lacy had been separated for five years continuously and that he had been paying the $400 bi-weekly sum throughout that period. Dawn also testified and corroborated the $100 bi-weekly payments that Lacy makes to her for their child.

At the close of the evidence and after hearing argument of counsel, the trial court ordered Lacy to pay $615.39 per month to Arvin for child support for Robin. The court calculated that sum using the child support guidelines and the stipulated gross monthly earnings figures of the parties. The court ruled that Lacy's payments to Catherine and Dawn for sup-

---

1. Neither Catherine nor Lacy expressly testified that the number of minor children they have together is three. Nevertheless, that number was implicit in their testimony, was stated by Lacy in his closing argument to the court, was not disputed by Arvin, and is acknowledged by the parties in their briefs in this Court.

port for his other four children constitute voluntary payments, not "obligations" to be subtracted in calculating his adjusted actual income under the guidelines. Also, in arriving at its child support award, the court did not deviate downward from the guidelines on account of those payments.

The court included a day care expense of $110 per week in its child support award. When the court was calculating the child support award, it asked Lacy whether he was making any payments for health insurance premiums for Robin. (Lacy, who was unrepresented at trial, had not given any testimony about health insurance.) In response, Lacy produced a pay stub showing that he was paying $25 per pay period for health insurance for his entire family, including all his children. Lacy then stated, in further response to questions from the court, that he did not incur any additional charge for including Robin on his health insurance policy. The court did not credit Lacy for any health insurance costs for Robin in calculating the child support award.

On July 27, 2000, the court issued an earnings withholding order for the monthly child support award of $615.34. The court then issued an "Amended Order" setting forth in detail the rulings it made at the conclusion of the July 24, 2000 trial. Lacy noted a timely appeal.

## DISCUSSION

### I

When determining child support, the circuit court must use the child support guidelines set forth in sections 12–201 et seq. of the Family Law Article. FL § 12–202(a)(1).[2] The law recognizes a rebuttable presumption that the amount of child support resulting from application of the guidelines "is the correct amount of child support to be awarded." FL § 12–

---

**2.** The child support guidelines were merely advisory when they first were adopted; their use became mandatory upon enactment of ch. 58 of the Acts of 1990. *See Petrini v. Petrini,* 336 Md. 453, 460, 648 A.2d 1016 (1994).

202(a)(2)(i). That presumption may be rebutted, however, "by evidence that the application of the guidelines would be unjust or inappropriate in a particular case." FL § 12–202(a)(2)(ii). The statute recites factors that the court may consider in making that determination. *See* FL § 12–202(a)(2)(iii). One such factor is "the presence in the household of either parent of other children to whom that parent owes a duty of support and the expenses for whom that parent is directly contributing." FL § 12–202(a)(2)(iii)(2). The presumption of correctness of the amount of child support under the guidelines may not be rebutted solely on the basis of evidence of that factor, however. FL § 12–202(a)(2)(iv).

If the court finds that in the case before it application of the guidelines would be unjust or inappropriate, it must make that finding in writing or in a specific on-the-record statement. FL § 12–202(a)(2)(v). In addition, the court must state the amount of support the guidelines would have required; how its child support order deviates from the guidelines; and "how the finding serves the best interests of the child." FL § 12–202(a)(2)(v)(2). In cases in which items of value are conveyed in lieu of a portion of support presumed under the guidelines, the court must state the value of those items. *Id.*

A schedule that appears in FL § 12–204(e) provides the means to calculate the support obligation under the guidelines. Section 12–204(a) directs that "[t]he basic child support obligation [for the child or children in question] shall be divided between the parents in proportion to their adjusted actual incomes." FL § 12–204(a). A parent's "adjusted actual income" means:

> [A]ctual income minus: (1) preexisting reasonable child support obligations actually paid; (2) except as provided in § 12–204(a)(2) ... alimony or maintenance obligations actually paid; and (3) the actual cost of providing health insurance coverage for a child for whom the parents are jointly and severally responsible.

FL § 12–201(d).

According to Lacy, the payments totaling $1,000 per month that he makes to the mothers of his four children other than

Robin are "preexisting reasonable child support obligations actually paid" under FL § 12–201(d)(1), notwithstanding that they are made without the compulsion of a court order. He argues, therefore, that the court should have subtracted $1,000 from his actual income in calculating his adjusted actual income. Because the court did not do so, its child support calculation under the guidelines was too high.

Arvin responds that the trial court properly construed FL § 12–201(d)(1) to mean that child support payments made without the compulsion of a court order are voluntary payments that are not "obligations" to be subtracted from actual income in determining a parent's adjusted actual income.

The meaning of the phrase "preexisting reasonable child support obligations actually paid," is an issue of statutory construction that is a question of law. *See Marzullo v. Kahl,* 135 Md.App. 663, 671, 763 A.2d 1217 (2000), *cert. granted,* 363 Md. 661, 770 A.2d 169 (2001); *State Dep't of Assessments & Taxation v. North Baltimore Ctr.,* 129 Md.App. 588, 595, 743 A.2d 759, *aff'd,* 358 Md. 608, 751 A.2d 470 (2000). Accordingly, we review the question *de novo. See PaineWebber Inc. v. East,* 363 Md. 408, 414, 768 A.2d 1029 (2001).

Our goal in statutory interpretation is "to ascertain and effectuate the intention of the legislature." *Haigley v. Department of Health & Mental Hygiene,* 128 Md.App. 194, 214, 736 A.2d 1185 (1999) (quoting *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999)). The primary source in that regard is the language of the statute itself. *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999) (citing *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994)); *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996) (citing *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986)). In considering the statutory language, we give the words their "ordinary and common meaning" and we "avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Haigley,* 128 Md.App. at 215, 736 A.2d 1185 (citations omitted). In addition,

[w]e often look to the legislative history, an agency's interpretation of the statute, and other sources for a more complete understanding of what the General Assembly intended when it enacted particular legislation.  In so doing, "[w]e may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain."  This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense.

*Adamson v. Correctional Med. Servs., Inc.,* 359 Md. 238, 251–52, 753 A.2d 501 (2000) (citations omitted) (second alteration in original).

The word "obligation," which is central to the phrase we are construing, has many connotations, ranging from a generalized duty to a specific debt.  *See, e.g.,* Webster's Third New International Dictionary (Unabridged) 1556 (1981).  We can best determine the import of the word "obligation" as it appears in FL § 12–201(d)(1) by considering its surrounding context and the purposes of the child support guidelines of which it is a part.

▬▬▬▬  The parents of a child are his natural guardians and, quite apart from the moral obligations of parenthood, owe the child a legal, statutory obligation of support.  *Thrower v. State ex rel. Bureau of Support Enforcement,* 358 Md. 146, 159–60, 747 A.2d 634 (2000); *see also* FL § 5–203 (stating that "[t]he parents of a minor child . . . are jointly and severally responsible for the child's support, care, nurture, welfare, and education"); *Petrini v. Petrini,* 336 Md. 453, 459, 648 A.2d 1016 (1994) (noting that the legal obligation of parents to support and care for their children is "based on both common law and statutory authority.").  A parent owes this obligation of support to the child, not to the other parent, *see Rand v. Rand,* 40 Md.App. 550, 554, 392 A.2d 1149 (1978), and owes it to the child regardless of whether the child was the product of a marriage.  *See Powley v. Owens,* 49 Md.App. 349, 354, 431 A.2d 749 (1981), *overruling Williams v. Williams,* 18 Md.App. 353, 306 A.2d 564 (1973).

When the parents and child live together, so that the child is in the parents' joint physical custody, it is presumed that each parent fulfills that parent's obligation of support to the child directly. When the parents live apart, however, it is presumed that the parent in whose custody the child resides fulfills his or her obligation of support directly; the other parent's support obligation then must be translated into dollars and paid to the custodial parent, for the child's benefit. FL § 12–204(k); *Anderson v. Anderson,* 117 Md.App. 474, 482, 700 A.2d 844 (1997), *vacated on other grounds,* 349 Md. 294, 708 A.2d 296 (1998).

■ One of the purposes of the child support guidelines is to permit ready and fair calculation of the financial obligation of child support that parents owe so that when parents are no longer living together, and the support obligation is not being fulfilled by both parents directly, the child nevertheless receives the full measure of financial support to which he is entitled under the law. *See Allred v. Allred,* 130 Md.App. 13, 17, 744 A.2d 70 (2000) (stating that "[t]he guidelines are premised on the concept that 'a child should receive the same proportion of parental income, and thereby enjoy the same standard of living, he or she would have experienced had the child's parents remained together.' ") (quoting *Voishan v. Palma,* 327 Md. 318, 322, 609 A.2d 319 (1992)).

■ Because the "obligation" referenced in FL § 12–201(d)(1) must be "actually paid" to be a factor in determining adjusted actual income, it must be the sort of obligation that is capable of being paid, i.e., a financial obligation. It must be for a definite sum, so as to allow the court to ascertain whether actual payment in fact has been made and to subtract the sum paid from actual income. In addition, because the sum is to be subtracted from the actual monthly income of the parent paying it, it must itself be payable on an ongoing basis. Finally, it must be enforceable, because an obligation that cannot be enforced is in effect not an obligation at all. *Cf. Zouck v. Zouck,* 204 Md. 285, 300, 104 A.2d 573 (1954) (holding that an agreement by a parent to support a child, declared to

be reasonable and proper, and thus enforceable by a court, constitutes an obligation justifying the invasion of a spendthrift trust).

To be sure, a court order directing a parent to pay child support is a "child support obligation" within the meaning of FL § 12–201(d)(1). When such a court order predates the point in time at which child support is being calculated for another child, and the monies directed to be paid have actually been paid, it meets the criteria spelled out in that statute and must be subtracted from the parent's actual income in calculating his adjusted actual income. The question remains, however, whether only a court order directing payment of child support qualifies as a "child support obligation" under FL § 12–201(d)(1), so that all other payments are considered voluntary, or whether there can be an obligation short of a court order that falls within the scope of that definition. Framed more particularly, may an agreement between parents for child support for their child (or children) ever qualify as a "child support obligation," within the meaning of FL § 12–201(d)(1); and, if so, what must be the essential characteristics of the agreement?

Again, we look to the language of FL § 12–201(d)(1) in answering these questions. That section includes a qualification that the child support obligation at issue must be "reasonable." Thus, the statute anticipates that in deciding whether there is a preexisting child support obligation that must be subtracted from the parent's actual income in calculating the parent's adjusted actual income, the court will be assessing the reasonableness of the obligation. The inclusion of this language would seem to indicate that the child support "obligations" referenced in FL § 12–201(d)(1) are not limited to those that are court-ordered. It would be a rare situation indeed in which a court assessing child support would have cause to conclude that the amount or terms of a preexisting child support order for another child of that parent was not reasonable. Reasonableness would be a more relevant inquiry when the sum being paid as a child support obligation was

agreed upon by the parents of the child, without the partic-
ipation and oversight of the court.

In examining the legislative history of FL § 12–201, we find
additional support for an interpretation of the language at
issue that would include payments not made subject to a court
order.   The child support guidelines were enacted in Mary-
land in February 1989 by passage of Senate Bill 49, ch. 2,
Laws of 1989.   As originally proposed, the language in SB 49
that eventually became FL § 12–201(d)(1) provided that
"preexisting *court-ordered* child support obligations" were to
be excluded from a party's gross income when determining
that party's adjusted gross income.   1989 Md. Laws ch. 2, § 1
(emphasis added).[3]   In the version of FL § 12–201(d)(1) ulti-
mately enacted into law, the General Assembly removed the
provision that a preexisting child support obligation must be
"court-ordered" to be subtracted from actual income and
added, in its place, the specification that such an obligation
must be "reasonable."   1989 Md. Laws ch. 2, § 1.

We hold that the trial court erred when it ruled, as a
matter of law, that for a child support obligation to be a
"preexisting reasonable child support obligation actually paid"
under FL § 12–201(d)(1), it must have been court-ordered.
In the context of this statute, a "child support obligation"
includes a contractual obligation to pay child support.   To the
extent that the contractual obligation constitutes a reasonable
sum of child support, preexists the award of child support at
issue, and is being performed (*i.e.,* is "actually paid"), it must
be subtracted from the paying parent's actual income in
calculating his adjusted actual income for purposes of deter-
mining child support under the guidelines.   This interpreta-
tion comports with the relevant statutory language and legis-
lative history, and effectuates the judicial policy favoring
private dispute resolution.   *Maryland–National Capital Park
and Planning Comm'n v. Washington Nat'l Arena,* 282 Md.

---

**3.**   When enacted, the phrase "gross income" was changed to "actual
income."   1989 Md. Laws ch.2, § 1.

588, 609–10, 386 A.2d 1216 (1978). A non-custodial parent who voluntarily undertakes to discharge his legal obligation to pay child support, by agreement with the other parent, should not have his responsible and non-litigious conduct count against him in a child support proceeding for another child.

"A contract is defined as 'a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.'" *Kiley v. First Nat'l Bank,* 102 Md.App. 317, 333, 649 A.2d 1145 (1994), *cert. denied,* 338 Md. 116, 656 A.2d 772, *cert. denied,* 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995) (quoting 1 Richard A. Lord, *Williston on Contracts* § 1.1, at 2–3 (4th ed.1990)). To be enforceable, a contract "must express with definiteness and certainty the nature and extent of the parties' obligations.... If the contract omits a term or is too vague with respect to essential terms, the contract may be invalid." *Kiley,* 102 Md.App. at 333, 649 A.2d 1145 (citations omitted); *see also Horsey v. Horsey,* 329 Md. 392, 420, 620 A.2d 305 (1993)(stating that in order to be enforceable, the terms of a contract must be of a sufficiently definite nature). An essential element in the formation of a contract is mutual assent by the parties to the terms thereof. *Klein v. Weiss,* 284 Md. 36, 63, 395 A.2d 126 (1978).

*Kramer v. Kramer,* 26 Md.App. 620, 339 A.2d 328 (1975), is instructive on the topic of what constitutes an enforceable agreement to pay child support. Mr. and Mrs. Kramer separated in 1967 and were divorced in 1974. Mrs. Kramer was awarded custody of the couple's eldest daughter, who was then 18 years old. She argued on appeal, in part, that "before 1 July 1973, the effective date of Art. I, § 24, which changed the age of majority from 21 to 18 years, the father had verbally agreed to support the children and that that agreement meant that he agreed to support the children until they reached the age of 21." *Id.* at 625, 339 A.2d 328. According to Mrs. Kramer, the parties entered into an oral agreement that Mr. Kramer would pay the mortgage, utilities, and insurance expenses, in addition to $150.00 every two weeks as support

for their three children. *Id.* at 625–26, 339 A.2d 328. Mr. Kramer did not deny the existence of an agreement with respect to child support, but argued that there was no agreement to support the children until age 21. *Id.* at 626, 339 A.2d 328.

The Court found the evidence sufficiently established that the parties had entered into an agreement with respect to support payments for the three children before the July 1, 1973 effective date of Art. I, § 24. *Id.* at 626–28, 339 A.2d 328. The Court stated:

> There is no requirement that there be a formal written agreement in matters involving separation, alimony, child support and custody. The existence of an agreement with respect to such matters may be verified from testimony, the conduct of the parties, and other evidence in the case. Here the mother's acceptance of payments unilaterally determined by the father to be appropriate, for a period of six years, without resort to a support action, constitutes acquiescence in and acceptance of an offer of support for the children made by the father, and, therefore, constitutes an agreement between the parties with respect to support payments for the three children. *See Eckard v. Gardner,* 255 Md. 171, 178, 257 A.2d 174, 177 (1969), *Rethorst v. Rethorst,* 214 Md. 1, 15, 133 A.2d 101, 109 (1957).

*Id.* at 626–27, 339 A.2d 328 (some citations and footnote omitted). The Court observed that both Mr. and Mrs. Kramer testified about facts supporting a rational inference that the agreement regarding support of the children did exist before July 1, 1973, that there was no denial by Mr. Kramer of the existence of the agreement, and that "[a]lthough the chancellor made no finding with respect to the existence of such an agreement, the corroborated evidence supports such a finding." *Id.* at 627, 339 A.2d 328.

In addressing the meaning of the contract, the Court explained that Maryland courts follow the objective law of contract interpretation, in which a court must determine, "from the language of the agreement itself, what a reasonable

person in the position of the parties would have thought the agreement meant at the time it was effectuated." *Id.* at 630, 339 A.2d 328. The Court noted that the agreement contained no express provision as to termination of the payments, and stated that only two possible interpretations of the agreement were reasonable. *Id.* at 630–31, 339 A.2d 328. The first possible interpretation was that Mr. Kramer intended to support "the children" for the rest of his life, because the children would always remain his children. *Id.* at 631, 339 A.2d 328. In discussing the other possible interpretation, the Court stated:

> Or, because the agreement was made by married persons living separate and apart, it could be viewed as one designed to satisfy the father's *legal obligation* to support his children, which obligation, under then existing law, required him to support his children until they reached the age of 21. The fact that the agreement contains no express provision for termination of payments does not permit it to be viewed as one allowing the father to terminate payments at any time. Such an interpretation would, in essence, view the father's promise as one to provide payments so long as he was willing so to do, a view which negates the very existence of an agreement because of the illusory nature of the father's promise.
>
> We think it obvious that in 1967 reasonable married persons, who had separated and had entered into an agreement for the support of their children, would have thought that that agreement was an agreement designed to satisfy, without the need of a court adjudication, the legal obligation of the supporting parent to his children, an obligation which at that time required support until the age of 21.

*Id.* (citations omitted).[4]

In the instant case, the trial court accepted the testimony of Lacy, Catherine, and Dawn that, pursuant to oral

---

4. While separated parents may enter into an enforceable agreement for support of their children, such an agreement is subject to modification

agreements with Catherine and Dawn that predated the proceedings, Lacy had provided and was continuing to provide financial support, in agreed upon amounts and at regular intervals, for his four children by those two women. Under the reasoning of the Court in *Kramer*, the oral agreements between Lacy and Catherine and between Lacy and Dawn were enforceable contractual obligations intended by the parties to them to satisfy Lacy's legal obligations to support his children.[5]

Accordingly, the evidence as accepted by the trial court established that the oral child support agreements between Lacy and the mothers of his other children were preexisting child support obligations actually paid. To the extent that these child support obligations were reasonable—a determination not made by the trial court, because of its disposition of the issue, and not susceptible of determination

---

by the court if modification is in the best interests of the children. FL § 8–103(a).

5. We point out for the sake of completeness that the oral child support agreements in this case would not be made unenforceable by the Maryland Statute of Frauds, which "[o]perat[es] to render unenforceable certain contracts by reason of their failure to conform with [its] requisite formalities...." *Friedman & Fuller, P.C. v. Funkhouser*, 107 Md.App. 91, 105, 666 A.2d 1298 (1995). According to the Statute of Frauds, Md.Code (1998 Repl.Vol.), § 5–901 of the Courts & Judicial Proceedings Article:

Unless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged ..., an action may not be brought ... [o]n any agreement that is not to be performed within 1 year from the making of the agreement.

The Statute of Frauds does not apply, however, when a contract can be completed within the span of a year by *any* possibility, even if the parties intended for the contract to extend for a longer period of time. *Griffith v. One Inv. Plaza Assocs.*, 62 Md.App. 1, 5, 488 A.2d 182 (1985) (citing *Ellicott v. Turner*, 4 Md. 476, 488 (1853)). Oral agreements for child support do not violate the requirement, under the Statute of Frauds, that an agreement not to be performed within a year must be in writing because, potentially, the child could die within the year, and thus the contract would be fully performed. *Kramer*, 26 Md.App. at 626 n. 2, 339 A.2d 328 (citing *Wilhelm v. Hardman*, 13 Md. 140, 149 (1859); *Ellicott v. Turner*, 4 Md. 476, 487–91 (1853)).

as a matter of law-they should have been subtracted from Lacy's actual income under FL § 12–201(d)(1). We therefore vacate the trial court's child support award respecting Robin and remand the case with instructions for the court to determine whether the agreements in question are "reasonable," or to what extent they are reasonable, and then to recalculate Lacy's child support obligation in a manner consistent with this opinion.[6]

## II

Lacy next contends that the trial court abused its discretion in failing to deviate downward from the child support guidelines on the basis of the financial support that Lacy provides to his other four children.

As we have explained, while there is a presumption that the amount of child support that would result from the application of the guidelines is the correct amount of child support to be awarded, that presumption "may be rebutted by evidence that the application of the guidelines would be unjust or inappropriate in a particular case." FL § 12–202(a)(2)(ii). Under FL § 12–202(a)(2)(iii)(2), in determining whether the application of the guidelines would be unjust or inappropriate in a specific case, the court may consider "the presence in the household of either parent of other children to whom that parent owes a duty of support and the expense for whom that parent is directly contributing." Lacy relies upon this statutory provision to argue that the court abused its discretion in not deviating downward from the guidelines.

Given our answer to Lacy's first question, we need not address this contention. We note, however, that the provision that Lacy invokes is of no relevance to the instant case. Lacy testified that none of his children reside with him in his household. Section 12–202(a)(2)(iii)(2) specifically refers to

---

6. The court has discretion on remand to take evidence and make findings about the current status of payments by Lacy to Catherine and Dawn for child support, including whether Lacy actually has made those payments.

situations in which other children of the parent reside in that parent's household. Furthermore, even if one of his other children resided with him, the presumption of correctness of the amount of child support awarded under the guidelines "may not be rebutted solely on the basis of evidence of the presence in the household of either parent of other children to whom that parent owes a duty of support and the expenses for whom that parent is directly contributing." FL § 12–202(a)(2)(iv).

### III

■■■ Lacy contends that the trial court erred in including the $110 per week day care expense for Open Door in its child support award despite Arvin's testimony that she was not actually incurring that expense at the time of trial.

Under FL § 12–204(g), in calculating child support under the guidelines, "actual child care expenses incurred on behalf of a child due to employment or job search of either parent shall be added to the basic [child support] obligation" and divided proportionately between the parents on the basis of their adjusted actual incomes. FL § 12–204(g)(1). Lacy argues that the cost of day care at Open Door was not an "actual" child care expense, because it was not being incurred at the time of trial.

FL § 12–204(g)(2) addresses the means by which child care expenses are to be determined. It provides:

Child care expenses shall be:

(i) determined by actual family experience, unless the court determines that the actual family experience is not in the best interest of the child; or

(ii) if there is no actual family experience or if the court determines that actual family experience is not in the best interest of the child:

1. the level required to provide quality care from a licensed source; or

2. if the custodial parent chooses quality child care with an actual cost of an amount less than the level required to provide quality care from a licensed source, the actual cost of the child care expense.

See *Chimes v. Michael*, 131 Md.App. 271, 291–93, 748 A.2d 1065, *cert. denied*, 359 Md. 334, 753 A.2d 1031 (2000)(discussing the mandatory language used by the legislature in FL § 12–204(g) and holding that "child care expenses always fall outside of the chancellor's discretion. . . ."); *Krikstan v. Krikstan*, 90 Md.App. 462, 471, 601 A.2d 1127 (1992)(stating that the inclusion of the word "shall" in statutory language "generally denotes an imperative obligation inconsistent with the idea of discretion," and holding that the amount of child care expense included the cost of an *au pair*, where the employment of an *au pair* was the actual family experience).

In the instant case, until shortly before trial, the "actual family experience" for child care for Robin had been that she attended a licensed day care facility. Arvin had removed Robin from the Open Door day care facility only because, without child support from Lacy, she was unable to afford the Open Door program (and already was behind in her payments to the facility). Arvin made it clear that if she were awarded child support for Robin, she would re-enroll her in the Open Door program.

The trial court did not err in determining that $110 per week was the "actual child care expense[ ] incurred" on behalf of Robin. Arvin's testimony about Robin having attended the Open Door day care facility during the school year, until Arvin no longer could afford to send her there, was a sufficient basis for the court to conclude that Open Door—a licensed day care facility—and not the unlicensed babysitter who was watching Robin at the time of trial, was the actual family experience for child care expenses for Robin under FL § 12–204(g)(2). That statute does not limit the "actual family experience" for day care expenses that the court may consider in calculating child support to the experience that is occurring at the time of trial. The court fairly could consider Robin's actual child care

experience in the months prior to trial in making that determination.

## IV

Lacy's final contention is that the trial court erred in calculating child support by failing to credit him for the cost of health insurance for Robin.

In determining a party's "adjusted actual income," FL § 12–201(d) requires that a court subtract from a parent's actual income the "actual cost" incurred by him in providing health insurance coverage for his child.

The only information before the court about the cost of health insurance came from Lacy and established that he had not incurred any actual cost for adding Robin onto his health insurance policy. For that reason, we perceive no error on the part of the trial court in deciding this issue.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED BETWEEN THE PARTIES.**