*Sayed A. v. Susan A.*
No. 1365, Sept. Term 2024
Opinion by Leahy, J.

**Contempt > Power to Punish, and Proceedings Therefor > Appeal or Error > Review**
The circuit court's failure to use the word "willful" in finding contempt does not, by itself, "rebut th[e] presumption" that the judge knew the law and applied it properly. *Bahena v. Foster*, 164 Md. App. 275, 288 (2005). Here, although the court articulated what may otherwise be a sufficient basis for finding Father in contempt, the court's express application of an incorrect legal standard renders that finding an abuse of discretion. *Breona C. v. Rodney D.*, 253 Md. App. 67, 73 (2021).

**Contempt > Punishment > Nature and ground in general**
As in *Jones v. State*, 351 Md. 264 (1998) the sanction contained in the Contempt Order "when first imposed certainly was coercive," because it encourages Father to facilitate the transfer of A. to Mother so that the 30-day sentence never goes into effect. 351 Md. at 279. But if Father fails to make the transfer on the date and time specified, there is no "provision in the order which would make the time to be served in jail contingent on any future conduct[.]" *Id.* at 282. Without "a post-confinement purge provision," incarceration has no coercive effect. *Bradford v. State*, 199 Md. App. 175, 202 (2011). The Contempt Order's sanction is therefore a punitive measure "reserved for criminal contempt proceedings[,]" and it was error for the court to impose it here. *Id.*

**Child Custody > Enforcement > Contempt**
Although circuit courts can "issue ancillary orders for the purpose of facilitating compliance or encouraging a greater degree of compliance with court orders" in contempt proceedings, *Dodson v. Dodson*, 380 Md. 438, 448 (2004), they cannot issue orders that effectively modify a prior custody determination without undertaking the same "procedural analysis" required in any other custody modification. *Kowalczyk v. Bresler*, 231 Md. App. 203, 213 (2016). This analysis must include (1) an assessment of whether there has been a material change in circumstance and, if so, (2) an assessment of the child's best interests. *Caldwell v. Sutton*, 256 Md. App. 230, 270 (2022).

**Constitutional Law > Due Process > Particular Issues and Applications > Families and Children > Child custody, visitation, and support**
Where incarceration is imposed as a sanction in a constructive civil contempt proceeding, "both the form and substance of due process and proper judicial procedure must be observed." *Thrower v. State ex rel. Bureau of Support Enf't*, 358 Md. 146, 161 (2000). This is particularly important "because a person's liberty is at stake[.]" *Id.* Any "[s]hortcuts that trample on these requisites[,]" such as the imposition of incarceration based merely on one party's unproven allegation that a contemnor has not purged contempt, "are not allowed." *Id.*

**Contempt > Power to Punish, and Proceedings Therefor > Attorneys' fees**

The Supreme Court of Maryland instructed in *Davis v. Petito*, 425 Md. 191, 200 (2012), that Maryland Code (1984, 2019 Repl. Vol.), Family Law Article ("FL") § 12-103 constitutes "an exception to the 'American rule[]'" allowing a court to award attorneys' fees in cases where it is applicable. In *Poole v. Bureau of Support Enf't*, 238 Md. App. 281, 294 (2018), we held, relying on the plain language of the statute, that FL § 12-103 is applicable in constructive civil contempt actions brought "to recover arrearages of child support" and "to enforce a decree of child support." By parity of reasoning, and in view of the plain language of the statute, FL § 12-103 also applies in constructive civil contempt actions brought "to enforce a decree of custody or visitation."

Circuit Court for Montgomery County
Case No. C-15-FM-22-003612

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1365

September Term, 2024

_____

SAYED A.

v.

SUSAN A.

_____

Arthur
Leahy,
Eyler, Deborah S.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: March 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Appellant Sayed A. ("Father") challenges a September 6, 2024 order of the Circuit Court for Montgomery County adjudicating him in constructive civil contempt of court (the "Contempt Order") for repeatedly violating a June 14, 2024 order granting appellee Susan A. ("Mother") sole legal and primary physical custody of one of their children (the "Custody Order"). Father's appeal is timely, and he presents six questions for our review, which we have consolidated and rephrased as follows:[1]

I.      Did the circuit court abuse its discretion in finding Father in constructive civil contempt of the Custody Order?

II.     Did the circuit court properly impose imprisonment as a sanction for the alleged constructive civil contempt?

III.    Did the circuit court err in awarding Mother compensatory damages during the contempt proceeding?

---

[1] Father's questions presented are:

1. Did the Trial Court commit reversible error in a constructive civil contempt proceeding when it adjudicated the Appellant in contempt without a requisite finding of willful or contumacious noncompliance?

2. Did the Trial Court commit reversible error when it imposed incarceration as a sanction for constructive civil contempt when the purge was conditioned on something beyond the contemnor's present ability to fulfill?

3. Did the Trial Court err as a matter of law and/or abuse its discretion when in it punished the contemnor for past noncompliance rather than imposing a sanction to promote future compliance?

4. Did the Trial Court err as a matter of law and/or abuse its discretion when it added obligations that did not exist in the original order?

5. Did the Trial Court err as a matter of law and/or abuse its discretion when it awarded compensatory damages in an action for constructive civil contempt?

6. Did the Trial Court err as a matter of law and/or abuse it discretion when it awarded attorney's fees in this action for constructive civil contempt?

IV.  Did the circuit court abuse its discretion in awarding Mother attorneys' fees?

First, we hold that the circuit court applied the incorrect legal standard in finding Father in constructive civil contempt of the Custody Order, and therefore abused its discretion. *See Breona C. v. Rodney D.*, 253 Md. App. 67, 73 (2021).  On the second issue, we hold that the court incorrectly imposed a determinate sentence of 30 days' incarceration without a proper purge provision.  The court further erred by placing provisions in the Contempt Order that (1) modified the custody determination in the Custody Order without the proper procedural safeguards, and (2) subjected Father to possible incarceration without a hearing to determine whether he was presently in contempt or no longer able to purge contempt.  From there, we conclude on the third issue that the court erred by awarding Mother compensatory damages for costs she was responsible for under the Custody Order.  Finally, despite the foregoing errors, we conclude that the court did not abuse its discretion in awarding Mother attorneys' fees under Maryland Code (1984, 2019 Repl. Vol.), Family Law Article ("FL") § 12-103, and we affirm that portion of the court's decision.  The record indicates that the court considered the factors required to award attorneys' fees under FL § 12-103.  We therefore affirm in part, and vacate in part, the judgment of the circuit court.

## BACKGROUND

### *Filing of Divorce and First Final Protective Order*

Father and Mother were married in 1999 and had two children together: O. (born

2

May 2006) and A. (born April 2009).[2] The parents' rapid fire legal actions began when the children were ages sixteen and thirteen. On June 24, 2022, Mother was granted a temporary protective order (case no. C-15-FM-22-808924) that required Father to immediately vacate the marital home and awarded Mother custody of both children. Two days later, Mother filed for divorce, seeking alimony, custody, and child support. In the protective order case, the circuit court entered a Consent Final Protective Order (the "First FPO"), effective July 1, 2022, which granted Mother custody of both minor children for one year or until further court order and stated that Father would have "non-overnight access with the children as agreed upon by the [p]arties[.]"

Father filed an answer to Mother's complaint for divorce on August 1, 2022, and a counter-complaint for divorce, custody, and child support on August 31, 2022.

### *Father Held in Contempt of the First FPO*

On July 27, 2022, Mother filed a motion requesting the court hold Father in contempt under the First FPO. Mother alleged that Father was attempting to communicate with her via the children, and that his "phone calls, voice mails, and in-person contact [were] tantamount to harassment[.]" The circuit court found Father in contempt on September 23, 2022, and required him to attend five in-person parenting classes.[3]

---

[2] To protect the children's identities, we will refer to each by letters contained within their first names.

[3] The transcript of the protective order court's ruling is not available in the record.

3

### A. Leaves Mother's Custody

On or around September 17, 2022, A. left Mother's custody and began living with Father at Father's parents' residence. Two weeks later, Mother filed an "emergency" motion in which she claimed that Father had ignored her repeated pleas for the child's return and alleged that A. had "rapidly begun to show alarming signs that she [wa]s becoming alienated from [Mother]." Father answered, claiming that A. had "run away from [Mother's] emotionally abusive care and refuse[d] to stay" with her. On the same day, October 5, 2022, the circuit court denied Mother's emergency motion but appointed a Best Interest Attorney ("BIA") for the minor children.

On December 22, 2022, following a two-day hearing in the divorce action, the circuit court entered a pendente lite custody order which, among other things, granted Mother temporary legal custody of both children as well as physical custody of O.[4] Father was granted physical custody of A. and ordered to pay Mother alimony and child support for O. The court also established bi-weekly visitation for the non-custodial parent and ordered reunification therapy for both parents.

### Father Again Held in Contempt of the First FPO

Mother filed a second motion for civil contempt against Father in the protective order case on February 3, 2023. Following a contested hearing, the court again found Father in contempt of the First FPO. Specifically, the court found that Father drove into

---

[4] This order, as well as the final custody order issued on June 14, 2023, were issued by the same circuit court judge who later issued the contempt order underlying the instant appeal.

the cul-de-sac in front of the marital home "on more than 10 occasions and did so with the intent to threaten, harass, stalk, or abuse" Mother and O.; that he "blasted loud music in an effort similarly to threaten, harass, or abuse [O.]"; and that he repeatedly called O. and visited her school. The court also noted that there was "overwhelming evidence" that the child was "startled, afraid and intimidated." As a sanction, the court imposed on Father a $100 fine for each day he continued to violate the First FPO. Father could purge the sanction each day by not contacting O. or entering the cul-de-sac of the marital home.[5]

### *The Second FPO*

The First FPO expired on July 25, 2023, and Mother filed a petition for a second protective order (C-15-FM-23-810499) for herself and O. on September 7, 2023. Mother alleged Father continued to repeatedly "driv[e] past [her] house playing loud music and shin[e] his car headlights into the windows of the house," even though Mother had informed him that this behavior scared her and O. and had asked him to stop. Another Consent Final Protective Order (the "Second FPO") was issued on October 25, 2023, by the parties' consent, effective through July 25, 2024.[6] On March 4, 2024, criminal charges

---

[5] In relevant part, the court's order provided:

> ORDERED THAT, FOR EACH DAY RESPONDENT COMPLIES WITH THE PURGE PROVISION, THE CONTEMPT FOR THAT DAY IS PURGED, AND THE FINE THAT WOULD OTHERWISE BE THE NEXT DAY WILL NOT BE DUE[.]

We do not address whether the court properly fashioned the sanction and purge provision in the First FPO, as the issue is not before us in this appeal.

[6] The Second FPO was subsequently extended several times and remains effective through July 25, 2026.

5

were brought against Father (case no. D-06-CR-24-2525) for violating the Second FPO.

*The Custody Order and Father's Non-Compliance*

Meanwhile, the circuit court conducted a nine-day custody trial between September 5, 2023 and February 6, 2024. On the last day of trial, the court took the matter under advisement and ordered the parties to undertake psychological evaluations and report back by May 2, 2024. On June 13, the court issued the Custody Order, granting Mother sole legal and primary physical custody of A.[7] and granting Father three hours of supervised visitation every other Saturday, beginning June 29. Outside of supervised visitation, the Custody Order prohibits Father from "communicat[ing] with the minor child . . . by any means" and taking any "action . . . or communicat[ing] anything or engag[ing] in any conduct to thwart or interfere with the reconciliation effort between Mother and the minor child." The Custody Order further required that Father drop off A. and her family dog "at Mother's home . . . by 6:00 p.m. on June 13, 2024." It gives Mother permission to "employ an individual or individuals to accomplish the transition of the minor child's custody to her" and provides that "Mother shall bear the cost of any such professionals retained." The Custody Order further provides that the access arrangement between Father and A. would remain in place for 60 days with child support temporarily suspended, and that the court would conduct a review hearing on July 23, 2024.

The next day, Mother filed a motion for contempt, alleging that Father had "failed and refused to bring" A. to the marital home as outlined in the Custody Order. Mother

---

[7] O. was emancipated by the time the Custody Order became effective.

6

requested that the court impose a financial penalty on Father and award her "contribution towards reasonable attorneys' fees." The court issued a supplemental custody order on June 14, authorizing Mother to "use all reasonable means to facilitate and accomplish the transition of custody of the minor child to her forthwith."

On June 18, Mother attempted to transfer A. from Father's parents' residence with help from a private firm, Supervised Visitation and Investigations LLC ("SVI"), and a therapist, Dr. Camille Jones, who had "been [A.]'s therapist in the past." She borrowed money from her father to pay Dr. Jones $8,000 and SVI $1,600. Mother did not inform Father that she had hired SVI to retrieve A. She later testified, at the August 9, 2024 show cause hearing, that she was "not sure if anybody was" going to be at Father's parents' residence at the time of the transfer, and that she "was worried [Father] would leave with [A.]" The SVI employee was unable to bring A. to Mother. At the show cause hearing, Father offered his version of what happened that day:

> I was taking a nap. [A.] came to -- running to my bedroom. She said that there was some weird white guy here claiming to be her relative, walking around our house. So I came to the front door to look and see what was happening. There was this guy on our property. His Jeep was parked in the driveway. I opened the door. I didn't recognize this person. He certainly wasn't any member of our family. So I wanted to make sure -- I was scared and confused, and so I wanted -- I started recording. He didn't like that. He started cursing me out. He hit me. He took my phone. He threw the phone in his car and drove away, and he hit me with his car.

Police subsequently arrived at the scene.[8] Father then left and took A. to her "babysitting

---

[8] At the show cause hearing on August 9, 2024, the video containing Father's statements to the police was played to refresh his recollection, but it was not admitted into evidence. Following this incident, the District Court of Maryland for Montgomery County
(Continued)

7

gig." Father explained at the show cause hearing that he did not drive A. to Mother "because . . . she was very shaken up, she was angry, and she wouldn't go." Father also related why he didn't deliver A. to Mother earlier as directed by the Custody Order:

> I told [A.] it's time to go. . . . [I]t occurred on June 13th before 6:00 p.m., which was the deadline. . . . Two or three times that evening, I -- you know, I held her hand. I said come on, it's time to go. She said no. I put the dog into the car. I put her -- I put -- like, I packed a suitcase. I put it in the car. I said [A.], come on, it's time to go. She was adamant. And I didn't pack the suitcase and put the dog in the car on subsequent days. But several days after that, I don't remember how many days, but I repeated this strenuously. And she started getting angry. She slams the door in my face. She locks the door to her bedroom. She goes into the bathroom.

On June 20, 2024, Mother and the BIA jointly filed a motion for civil contempt, alleging that Father "assaulted and threatened" the SVI employee and then drove away with A. They requested, among other things, that the court hold Father in contempt, "bestow upon the Sheriff the authority to remove" A. from Father and place her into Mother's custody, and order Father to reimburse Mother $5,600.00 for the mental health and security professionals that she hired to effectuate the Custody Order. On June 26, the court issued a second supplemental order, giving Father "another chance to bring the minor child to [Mother], himself, to spare the child any trauma that may attend the police being involved to facilitate the transfer of physical custody." Accordingly, the court ordered Father to "immediately return the minor child . . . to the custody of [Mother]" no later than 9:00 am on June 27, 2024." Mother, in turn, was authorized to use "all reasonable means,

---

issued an arrest warrant for second-degree assault and trespass to private property against the SVI employee, but the State ultimately entered *nolle prosequi* on all charges and recalled the warrant.

including without limitation the assistance of any appropriate law enforcement officers and/or other law enforcement personnel to aid in the transfer of the physical custody of the child." Once again, A. did not return to Mother by the deadline.

On June 28, 2024, Father appeared in the District Court of Maryland for Montgomery County for a criminal trial on his alleged violation of the Second FPO. He was with his parents and A., hoping that the child would testify for him at the trial. Mother waited outside the courtroom with the Custody Order. Upon seeing Father and A. a few yards away, Mother gave the Custody Order to an assistant state's attorney. As the attorney was speaking with sheriffs, Mother saw Father walking A. towards an elevator. After A. left the area, the police approached Father, who allegedly said, "I don't talk to cops."

Mother filed a third motion for civil contempt of the Custody Order on July 1, 2024. She requested that Father "be incarcerated as a result of his contemptuous actions" until he purged himself of the contempt. Mother also requested reimbursement of the expense of hiring Dr. Jones and SVI for the failed custody transfer on June 18, and attorneys' fees related to preparing the three motions for contempt of the Custody Order.

### The First Show Cause Hearing (August 9, 2024)

On August 9, 2024, the court held a show cause hearing on Mother's June 14 motion for contempt and the June 20 joint motion for contempt. The court did not hear Mother's July 1 motion for contempt, which asked for imprisonment, as the show cause hearing notice for that motion had not been served on Father.

Both Father and Mother testified regarding the series of events that occurred following the entry of the Custody Order. Father admitted that he had failed to comply

9

with the terms of the Custody Order by having failed to transfer custody of A. and by continuing to have contact with A. other than through supervised visitations. However, Father described his efforts to transfer custody of A., stating that he had "coax[ed] her . . . [and] tr[ied] to persuade her" to go to Mother. Father also stated that he could not "trick" the child because she was "big and strong" and "very smart." When asked why he did not just take A.'s dog to Mother, Father stated that he did not "feel that [he was] permitted to go anywhere near the marital home with just the dog[.]"

At the end of the hearing, the court decided to defer its ruling until the show cause hearing set for September 6 on Mother's third motion for contempt, expressing its plan to rule on all contempt motions at the same time.

### *The Second Show Cause Hearing (September 6, 2024)*

During the time between the first show cause hearing on August 9 and the hearing on September 6, 2024, A. returned to Mother on multiple occasions, although none of them lasted for more than a night. One night in August, Father persuaded A. to go to Mother by telling her that she could get permission to play field hockey. Father dropped A. off at the marital home and left after she entered the home. When Mother found A. in the marital home, A. asked her to sign her up for field hockey. Mother noticed that A. only had a backpack and a little duffle bag, which A. insisted was all of her belongings. A few hours later, A. left the marital home and returned to Father's parents' residence.[9]

---

[9] At the show cause hearing on September 6, 2024, Father admitted that his mother might have picked up the child. Father's parents' residence is roughly "a quarter mile" from the marital home.

A few days later, Father again drove A. over to the marital home to drop her off. Mother testified that she had been at work when Father's attorney notified her that Father was bringing A. to the marital home. She promptly drove there, where she saw Father and A. in the driveway, sitting in Father's vehicle. She did not approach Father's car, because she was waiting for A. and her belongings to be unloaded and she "didn't want to go near" Father. Mother said that if she had received earlier notice, she could have asked for A.'s therapist or additional support to be present. About five minutes later, Father drove away without dropping off A. or her belongings.

Father testified that on "[t]he subsequent Sunday," he brought A. to the marital home a third time, along with her dog and bags. Father arrived "at, like, 7:30 in the morning" and remained in the driveway for "[a]bout 20 minutes." However, A. "was not happy" and refused to get out of the car, so he drove her back to his parents' residence. They returned again "three hours later," but after "half an hour" of waiting, A. still refused to leave the car and go inside the marital home, despite Father's urging her to "go inside, knock on the door, go, call [Mother]."

According to Father, that was the last time he tried to take A. to the marital home by himself. Father explained that his family members took A. to the home on multiple occasions thereafter. Mother testified that at "midnight," "about a week" after Father's last attempt to drop A. off, she showed up at the marital home unannounced. Mother stated that A. arrived when she and O. were already in bed, that A. had only a backpack, and that the dog was not with her. Mother left the next morning to notify her work that she planned to stay home that day because A. had unexpectedly returned. However, when Mother

11

returned about an hour later, A. was not there.

Father testified that he stopped trying to bring A. to the marital home because on August 20, 2024, he had been sentenced to two years of probation with 90 days of back-up time for violating the Second FPO, and that "one of the probation conditions [was] that [he] have no con[tact] whatsoever" with O. and A.[10]  Father testified that he understood the court's instructions to mean he "should not . . . do any child exchange[.]"[11]

The court also heard Father's testimony regarding his current financial situation. Father stated that he owed his counsel "between $44,000 and $45,000" as of July 2024. He acknowledged that he had been employed with his current employer since the beginning of June 2024, earning $175,000 a year along with a maximum bonus of $17,600.  Father also acknowledged that he had received a sign-on bonus of $25,000, contingent upon his remaining employed for a minimum of one year.

### Contempt Finding and Order

Before delivering its ruling, the court asked Mother's counsel, who requested that

---

[10] At the second show cause hearing on September 6, 2024, the transcript from the sentencing hearing was admitted into evidence without objection.

[11] Near the end of the sentencing, the following exchange occurred between the State, the sentencing court, and the defense counsel:
> [DEFENSE COUNSEL:] There's a child that goes from house to house.
> THE COURT: Uh-huh.
> [DEFENSE COUNSEL:] [Father] may be in the position of dropping off his daughter to the residence.  If clear exception could be made --
> * * *
> THE COURT: Okay. Well, they have to figure out another way to make that happen, other than him coming there to drop her off. Okay?
> [DEFENSE COUNSEL:] Understood, Your Honor. Thank you.

12

Father be imprisoned for contempt of the Custody Order, how Father could return A. if he was incarcerated. In response, Mother's counsel stated:

> [MOTHER'S COUNSEL:] Well, he can -- well, a couple of things. So we had already said that we would send an Uber. He could send an Uber. He could -- you know, he could have his parents, who are very capable, because they've been going back and forth. So he can have all of that happen. He could also have a fine imposed every single day.
>
> * * *
>
> You could send Dr. Jones over to get her with [Mother.] You -- I mean, there's so many ways. In fact, it would be better that [Father] doesn't go to the house because there is this . . . order of protection.

In her closing argument, the BIA emphasized that A. was returning to Father's parents' residence because she felt she was entitled to and urged the court to "address ways to prevent her from being able" to do so. Mother's counsel added that this was within Father's control, stating that "[h]e simply has to deliver her belongings to [the marital home], deliver the dog to [the marital home], and not open the door."

After hearing the parties' arguments, the court proceeded to announce its ruling on the record. The court observed that the "clear intent" of the Custody Order was "to try to . . . specify how things were to go in terms of having [A.] delivered[,]" noting that it specifically required Father to drop off A. and her dog at the marital home by 6:00 p.m. on June 13, 2024. The court found that Father failed to show he "couldn't have done any more to comply with the order[,]" reasoning:

> **He could have refrained from confronting [the SVI employee] on the occasion where that gentleman went to his home for the purpose of obtaining [A.] in furtherance of effectuating the court order.** He could have cooperated instead of participating in the confrontation with him. The [c]ourt saw the video.

13

**He could have facilitated the transfer when [A.] was brought to district court, instead of, apparently, upon remembering that the court order that the [c]ourt signed after the custody order, that one of them authorized the assistance of law enforcement in obtaining her return.** Apparently he, upon realizing that, took efforts to spirit her away so that that order could not be effectuated on the day of the district court proceeding. She was there on the floor with her mother, and he left and took her down at least to the third floor, by his own admission, to talk to the public defender's office. And then -- and he was the one that drove her to the courthouse to begin with, to testify, apparently, or thinking she would or might testify at that proceeding in his defense.

**But in any event, he took steps thereafter that were in violation, not only to procure her departure from the courthouse before law enforcement could intervene, but when law enforcement tried to intervene, he told them I don't talk to cops.** How that constitutes anything other than a violation of the provision of the [c]ourt's order where it says Father shall take no action, say, or communicate anything or engage in any conduct to thwart or interfere with the reconciliation effort between Mother, et cetera, and fully and completely facilitating and supporting the physical custody arrangement outlined in the order, would be beyond me.

In fact, it is directly contrary to that provision of the order.

\* \* \*

**His claim that he was under the -- last time, that he was under the impression that the dog was only to be turned over if [A.] was turned over is too clever by half.** The fact of the matter is that if he had turned the dog over, it might have heightened the chances of [A.] going with her mother, given her affinity or fondness for the dog. Doing so might have assisted, in fact, in facilitating compliance with portions of the [c]ourt's order.

(Emphasis added). The court further observed:

There have been times, as the evidence indicated today, when [Father] has actually taken [A.] to the house that [Mother] resides in. But clearly, according to the testimony, the times selected and the circumstances selected were not such as to afford the best chance of having the transition succeed. In fact, **it appears to the [c]ourt that the way he has manipulated or tried to accomplish this were designed or crafted so that the effort would not succeed. It was seemingly designed so that the effort would not succeed.**

14

Finally, the court noted Father's history of non-compliance with various court orders:

> It -- the – it's not lost on the [c]ourt, the history of this case and related cases, that he has a pattern and practice of disregarding court orders. And that does nothing to help him in any argument that he might otherwise make to try to suggest he's generally deferential to and observant of the requirements of orders that were imposed on him. Most -- and not the least of which have been the repeated violations of protective orders.
>
> I think the evidence indicates that there have been two prior occasions [on which] he's been found in contempt of protective orders by different members of this bench. And then now he's been convicted of a violation and actually sentenced to a term of imprisonment, albeit it suspended. So this man is a clear and unequivocal scofflaw. And his argument -- his actions are every bit contemptuous.

The court thus concluded that "the way to obtain [Father's] compliance . . . with the terms of the [Custody Order]" was to sentence him to 30 days of incarceration. After adjudicating Father in contempt of the Custody Order, the court turned to the issue of awarding compensatory damages and attorneys' fees to Mother. The court found that Mother had "substantial justification" in seeking attorneys' fees based on Father's repeated failure to comply with the court's orders. The court awarded $8,000 for Mother's attorneys' fees and $9,600 for her costs and expenses associated with retaining SVI and Dr. Jones. In awarding the compensatory damages and attorneys' fees, the court noted that Father's yearly salary of $175,000 is "not insignificant" and that there was no evidence of his expenses other than the attorneys' fees he owed to his counsel.

Immediately after the second show cause hearing, the circuit court entered the Contempt Order, which reflects its oral ruling on the record. In relevant part, the Contempt Order sets out the *grounds for contempt*:

15

**ORDERED,** that [Father] is hereby found to be in constructive civil contempt of the Custody Order dated June 13, 2024 and docketed June 14, 2024 for violation of the following provisions, [Mother] having proven [Father's] non-compliance with them and [Father] having failed to meet his burden of proving that he could not do more than he did to comply with them:

1. Father shall drop off the minor child [at] Mother's home to begin the ordered custody arrangement by 6:00 p.m. on June 13, 2024. Father shall bring the minor child's dog with her to Mother's home.

2. Father shall not communicate with the minor child outside of the supervised visitation by any means verbally or by written correspondence, email, text, voicemail, WhatsApp, Google Voice communication, or any other electronic means, either directly or indirectly through third parties.

3. Father shall take no action, say, or communicate anything or engage in any conduct to thwart or interfere with the reconciliation effort between Mother and the minor child. Father shall fully and completely facilitate and support the physical custody arrangement outlined in this order, including, without limitation, following all requirements and protocols established by the reunification therapist[.]

Next, the order provides the following *sanction*:

**ORDERED,** that [Father] is sentenced to thirty (30) days of incarceration, to be served at the Montgomery County Detention Center, and said sentence is deferred to September 10, 2024[.]

The sanction is followed by the following *purge provisions*:

**ORDERED,** that [Father] may purge the [c]ourt's finding of Contempt by:
1. [Father] shall arrange for the minor child [ ] to be dropped off at [the marital home] at 4:00 pm on Monday, September 9, 2024.

2. The minor child shall be dropped off to [Mother] with all her clothing, electronics, and belongings, along with her dog[.]

3. For a period of sixty (60) days from Monday, September 9, 2024, [Father] shall not allow the minor child to return to his current residence ([Father'] s parent's home) or from being for any length of time in any other place [Father] is residing, and further, if during the

16

aforesaid 60 day period, the minor child should return to any place in which [Father] is residing, including but not limited to [Father's] home, [Father] shall leave that location, not take the child with him and shall remain away from that location for as long as the child is there.

4. For a period of sixty (60) days from Monday, September 9, 2024, [Father] shall refrain from any contact [with] the minor child, either in-person, by phone, by text, by email or by any other electronic means or written communication[.]

The order provides that the *sanction* will be imposed under the following *conditions*:

**ORDERED,** that if [Father] fails to comply with condition 1 and/or 2, noted above, he shall report to the courtroom of the undersigned judge . . . at 4:30 p.m. on Tuesday, September 10, 2024 to be taken into custody and begin serving his period of incarceration, and it is further,

**ORDERED,** that if [Father] fails to comply with conditions 3 and/or 4 above, then, upon filing of a line by [Mother] or her counsel or the court-appointed Best Interest Attorney, so indicating, he shall report to the courtroom of the undersigned judge . . . on a date and time within 7 days after such notice, to be set by the court and of which he will be notified, to be taken into custody and begin serving his period of incarceration. Said period of incarceration for violation of any or all the purge provisions set forth in paragraphs 1, 2, 3 and 4 shall not cumulatively exceed a total of 30 days[.]

The order further states:

**ORDERED,** that pending further order of court, for any period beyond 60 days from the date of entry of this order, Father shall not communicate with the minor child outside of the supervised visitation by any means verbally or by written correspondence, email, text, voicemail, WhatsApp, Google Voice communication, or any other electronic means, either directly or indirectly through third parties[.]

Finally, the order awards Mother *compensatory damages and attorneys' fees*:

**ORDERED,** that [Father] shall pay to [Mother's] attorney[s'] fees in the amount of Eight Thousand Dollars ($8,000.00) as fair and reasonable amount for attorneys['] services incurred in conjunction with [Mother's] efforts to obtain [Father's] compliance with this Court's June 14, 2024 Custody Order, the Supplemental Order (docketed 6/17/2024), and the

Second Supplemental Order (docketed 6/26/2024) and judgment is hereby forthwith entered against [Father] and [in] favor of [Mother] in this amount; and it is further,

**ORDERED,** that [Mother] is hereby further awarded the sum of Nine Thousand Six Hundred Dollars ($9,600.00) as contribution to costs and expenses incurred by [Mother] in connection with [Father's] non-compliance with the court's orders: Custody Order (docketed 6/14/2024[)], the Supplemental Order (docketed 6/17/2024), and the Second Supplemental Order (docketed 6/26/2024), and judgment is hereby forthwith entered against [Father] and [in] favor of [Mother] in this amount.

In sum, the Contempt Order purports to hold Father in constructive civil contempt of the Custody Order and imposes 30 days of incarceration as a sanction, deferred to September 10, 2024. The Contempt Order provides that Father may purge the contempt by (1) arranging the drop-off of A. at Mother's house by September 9, 2024, along with all her clothing, electronics, and belongings, as well as the dog; (2) not allowing the child to return to Father's residence; and (3) refraining from any contact with the minor child for 60 days.

### September 9, 2024 Incident and Subsequent Events

On September 9, 2024, Father arranged for his sister to drop off A. at the marital home, along with A's belongings and the dog. Father's sister, along with her two children, drove A. to the marital home, but A. refused to leave the car. Mother called the police, who spoke with A., but she still would not leave the car. When A. finally got out of the car, she immediately started walking away from the marital home, holding the dog. Father's sister and her children drove away.

The following day, Father filed a line to purge his contempt. Father attached his sister's affidavit in which she attested that A. had been dropped off at the marital home

18

along with her belongings and the family dog. Father also attached his own affidavit in which he attested that, upon learning that A. had walked away from the marital home after being dropped off, he left his parents' residence to avoid contact with A. Father timely filed the underlying appeal of the Contempt Order on the same day, September 10, 2024.

Mother responded the same day by filing a line in which she claimed that Father failed to purge contempt. Mother attested in her affidavit that the police reported A. entering Father's parents' residence, "where [Father] was present with his parents." Mother further attested that Father's sister dropped off "garbage bags" containing miscellaneous items, such as "16 hoodies, 1 pair of pants, 1 roll of toilet paper, a broken toy . . . some half-used shampoos" but no "pajamas, no special pillow that [A.] is known to travel with, no cellphone charger, no retainer, no school ID, no school binder or books . . . not even close to all of her clothing."

The court held a hearing about two hours later. Although Father was given a Zoom link, he did not appear. The court asked Father's counsel about the reason for his absence, and counsel stated that Father "thought he had complied with the conditions of the court" and did not anticipate there being a hearing. Counsel further pointed out that he had "filed a line with some affidavits about that." The court stated that Father "was not excused from appearing just because of his own self-assessment about being in compliance," and opined that it was not "really prudent for him not to come." The court then issued a body attachment for Father, which was served on him on September 27, 2024.

Father was held in custody until October 4, 2024, as a result of his failure to appear at the September 10 hearing. On October 18, the court held an evidentiary hearing, where

19

Father, Mother, and Father's sister testified regarding the series of events that occurred on September 9, 2024. The court found that Father failed to "completely purge" himself but declined to impose any period of incarceration.[12]

## DISCUSSION

## I.

## STANDARD OF REVIEW

"Any person may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him in contempt of court, including an interlocutory order, remedial in nature, adjudging any person in contempt, whether or not a party to the action." Maryland Code (1973, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP") § 12-304. It is well established that civil contempt "must be

---

[12] Neither party has addressed whether the court's October 18 ruling rendered any of Father's challenges in this appeal moot. Father asserts in his brief on appeal, however, that the court's statement amounted to a ruling that he has "sufficiently purged himself of contempt."

We have held that contemnors "remain[] entitled to seek exoneration" for a contempt *finding* even after the court rules that contemnors have purged themselves of contempt. *Droney v. Droney*, 102 Md. App. 672, 682 (1995). Both this Court and the Supreme Court of Maryland have held that a challenge to a contempt order's *sanction* or *purge provisions* becomes moot once the contemnor purges themselves of contempt. *See Young v. Fauth*, 158 Md. App. 105, 113 (2004); *Arrington v. Dep't of Hum. Res.*, 402 Md. 79, 90 (2007). Once contempt is purged, the sanction in a contempt order "no longer exists" and cannot "be reinstituted absent a new finding of contempt." *Arrington*, 402 Md. at 91. Sanctions and purge provisions do not carry the "indirect or collateral consequences" of a contempt *finding* – namely, the badge of having been declared a contemnor. *Id.*

The court's ambiguous October 18, 2024 ruling does not convince us that Father's contempt "no longer exists." *Id.* Moreover, although the circuit court elected not to incarcerate Father on October 18, it technically retained the power to incarcerate him at all times prior to this appeal. Accordingly, we conclude that the October 18 ruling did not render any part of Father's challenge to the Contempt Order moot.

proven by a preponderance of the evidence." *Royal Investment Group, LLC v. Wang*, 183 Md. App. 406, 448 (2008). Generally, an appellate court will not "disturb a contempt order absent an abuse of discretion or a clearly erroneous finding of fact upon which the contempt was imposed." *Kowalczyk v. Bresler*, 231 Md. App. 203, 209 (2016). "In reviewing factual findings on which a contempt order is based, '[i]t is not our task to re-weigh the credibility of witnesses, resolve conflicts in the evidence, or second-guess reasonable inferences drawn by the court, sitting as fact-finder.'" *Md. Dep't of Health v. Myers*, 260 Md. App. 565, 618 (2024) (alteration in original) (quoting *Gertz v. Md. Dep't of Env't*, 199 Md. App. 413, 430 (2011)). However, "where the order involves an interpretation and application of statutory and case law, we must determine whether the circuit court's conclusions are 'legally correct' under a *de novo* standard of review." *Kowalczyk*, 231 Md. App. at 209.

## II.

## CONTEMPT FINDING

### A. Parties' Contentions

Father argues that the circuit court "committed a reversible error by adjudicating [him] in contempt without a finding of willful or contumacious noncompliance." He relies on the Supreme Court of Maryland's instruction in *Dodson v. Dodson*, 380 Md. 438, 452 (2004), that "one may not be held in contempt of a court order unless the failure to comply with the court order was or is willful." Father contends that the circuit court made a "misstatement of the law" during the August 9, 2024 hearing when, in response to his counsel's contention that "in cases involving contempt, the burden is on the plaintiff . . . to show that . . . the defendant willfully and deliberately" violated a court order, the circuit

21

court judge stated that a plaintiff merely had the burden "to show noncompliance" with the order. Father locates this same error in the court's ruling on the record and in the Contempt Order itself.

Mother counters that "the court need not use the term 'willfulness' for there to be a sufficient finding of willfulness," citing this Court's decision in *Bahena v. Foster*, 164 Md. App. 275, 288 (2005). Mother points out that the circuit court "stated several times in several different ways that [Father's] actions were deliberate and designed to fail to comply with" the Custody Order. Consequently, Mother asserts, "[i]t is clear that . . . the [circuit court] correctly applied the legal standard in finding [Father] took purposeful steps to not comply with the court order, and thus did so willfully."

### B. Legal Framework

The inherent power of the courts to hold persons in contempt is "a principal tool to protect the orderly administration of justice[.]" *Usiak v. State*, 413 Md. 384, 395 (2010); *see Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). In Maryland, CJP § 1-202(a) provides broadly that a court "may exercise its power to punish for contempt of court or to compel compliance with its commands in the manner prescribed by Title 15, Chapter 200 of the Maryland Rules[,]" which governs both civil and criminal contempt proceedings. The Maryland Rules do not explicate the standard for finding contempt; however, our decisional law makes plain that one may not be held in criminal or civil contempt of a court order "unless the failure to comply with the court order was or is willful." *Dodson*, 380 Md. at 452; *see also Myers*, 260 Md. App. at

22

616 ("The failure to comply with a court order, however, is insufficient, by itself, to support a contempt finding. . . . [T]here must be a showing that the failure to comply with the court order was willful.") (internal citations omitted).

In reviewing a determination that conduct was willful, this Court's task is to "decide whether the evidence 'is sufficient to support the court's finding of willfulness.'" *Myers*, 260 Md. App. at 618 (quoting *Gertz*, 199 Md. App. at 431). In the context of a contempt proceeding, "[w]illful conduct is action that is '[v]oluntary and intentional, but not necessarily malicious.'" *Wang*, 183 Md. App. at 451 (quoting *Black's Law Dictionary* 1630 (8th ed. 2004)). The willfulness of the alleged contemnor's frustration of a court order "must be established by evidence, and cannot simply be 'assumed.'" *Dorsey v. State*, 356 Md. 324, 352 (1999). However, "evidence of an ability to comply, or evidence of a defendant's conduct purposefully rendering himself unable to comply [with a court order], may, depending on the circumstances, give rise to a legitimate inference that the defendant acted with the requisite willfulness[.]" *Id.*

The circuit court need not explicitly use the word "willful" to find a defendant in contempt, provided that "the court's ruling, when read as a whole, clearly implies that" the court found the defendant's conduct willful. *Bahena*, 164 Md. App. at 288. In *Bahena*, this Court explained:

> [T]he circuit court "does not have to follow a script. Indeed, the judge is 'presumed to know the law, and is presumed to have performed his duties properly.'" *Durkee v. Durkee*, 144 Md. App. 161, 185 (2002) (quoting *Lapides v. Lapides*, 50 Md. App. 248, 252 (1981)). That the circuit court did not use the term "willful" in finding that the Bahenas had violated the consent order at the original hearing does not rebut this presumption, given that there is no evidence that the court did not know or apply this standard. Moreover,

23

the court's ruling, when read as a whole, clearly implies that the court found the Bahenas' conduct to be willful and the court's clarification of what it meant at the "damages" hearing confirms that.

*Id.*

## C. Analysis

The circuit court failed to find that Father willfully violated the Custody Order. In announcing its ruling, the court stated that "in a constructive civil contempt proceeding, it is the petitioner's burden to establish noncompliance with the [c]ourt's order, and then the burden shifts to the defendant to establish that he couldn't have done any more to comply with the order than he did."[13] The circuit court's exchange with Father's counsel during

[13] While the court did not clarify the source of this burden-shifting approach, it appears similar to the provisions of Rule 15-207(e)(2) and (3):

> (2) **Petitioner's Burden of Proof.** Subject to subsection (3) of this section, the court may make a finding of contempt if the **petitioner proves by clear and convincing evidence that the alleged contemnor has not paid the amount owed**, accounting from the effective date of the support order through the date of the contempt hearing.
>
> (3) **When a Finding of Contempt May Not Be Made.** The court may not make a finding of contempt if the alleged contemnor proves by a preponderance of the evidence that (A) from the date of the support order through the date of the contempt hearing the alleged contemnor (i) **never had the ability to pay more than the amount actually paid** and (ii) **made reasonable efforts** to become or remain employed or otherwise lawfully obtain the funds necessary to make payment, or (B) enforcement by contempt is barred by limitations as to each unpaid spousal or child support payment for which the alleged contemnor does not make the proof set forth in subsection (3)(A) of this section.

(Emphasis added). Rule 15-207(e) applies only "to proceedings for constructive civil contempt based on an alleged failure to pay spousal or child support[.]" Rule 15-207(e)(1); *Arrington*, 402 Md. at 97. Unlike in other constructive civil contempt proceedings, in which a finding of a present ability to comply with the relevant court order is an essential prerequisite to a finding of contempt, "a finding of contempt under 15-207(e) requires only a determination that the alleged contemnor had the ability *in the past* to comply with the

(Continued)

24

the August 9, 2024 hearing further highlights the court's misunderstanding of the standard

for finding contempt:

> [FATHER'S COUNSEL]: Yes, Your Honor. But Your Honor may recall that in cases involving contempt, the burden is on the plaintiff, the person that's seeking the contempt, to show that this -- that the defendant willfully and deliberately –
>
> THE COURT: No, that's not true.
>
> [FATHER'S COUNSEL]: -- disobeyed the court order.
>
> THE COURT: That's not true. That's not true. Their burden is to show noncompliance.
>
> [FATHER'S COUNSEL]: Yes. And . . . the burden shifts to [Father] to show that he took efforts to comply to the order.
>
> THE COURT: Could not have done more than he did.

To the extent that these statements reflect the court's view that it need not find the

alleged contemnor's violation of a court order to be willful, the court erred. *See Dodson*,

380 Md. at 452; *Myers*, 260 Md. App. at 616; *State v. Crawford*, 239 Md. App. 84, 111

court order[.]" *Jones v. State*, 351 Md. 264, 276 (1998) (emphasis added).  In *Rawlings v. Rawlings*, 362 Md. 535 (2001), the Supreme Court observed that the primary purpose of Rule 15-207(e) was to address the fact that "it is extremely difficult, if not impossible, to have [] immediately up-to-date information" at the time of a contempt hearing, on whether an alleged contemnor presently can make the payments required under a child support order.  *Id.* at 550 (quoting Letter from Hon. Alan M. Wilner, Chairman, Standing Committee on Rules of Practice and Procedure, to the Court of Appeals (Oct. 31, 1996) (on file with Standing Committee on Rules of Practice and Procedure)).  The adoption in 1997 of Rule 15-207(e) did "not change[]" the "requirement" that "any party judged to be a civil contemnor must be afforded the opportunity to show a present inability to purge the contempt" before incarceration may be imposed. *Jones*, 351 Md. at 276.   Because the instant appeal does not arise out of an alleged failure to pay spousal or child support, Rule 15-207(e) does not apply.

(2018). This misunderstanding ultimately found its way into the Contempt Order itself:

> **ORDERED,** that [Father] is hereby found to be in constructive civil contempt of the Custody Order dated June 13, 2024 and docketed June 14, 2024 for violation of the following provisions, **[Mother] having proven [Father's] non-compliance with them and [Father] having failed to meet his burden of proving that he could not do more than he did to comply with them**[.]

(Emphasis added). Because the circuit court based its contempt finding on the incorrect legal standard, that finding constitutes an abuse of discretion. *See Breona C. v. Rodney D.*, 253 Md. App. 67, 73 (2021) ("A trial court abuses its discretion when its decision encompasses an error of law[.]").

We observe that the court made findings from which it would have been permitted to infer willfulness. *See Dorsey*, 356 Md. at 352; *Myers*, 260 Md. App. at 618. The court extensively recounted Father's history of noncompliance with the Custody Order, observing that "he had the ability to comply" with the Custody Order "and absolutely did not repeatedly, day in, day out." The court found that Father had engaged in "conduct to thwart or interfere with the reconciliation effort between" Mother and A. on multiple occasions, including when he "took efforts to spirit [A.] away" from Mother and law enforcement at the district court. The court further found that the times and circumstances in which Father had previously taken A. to the marital home to transfer custody appeared "designed or crafted so that the effort would not succeed." As in *Gertz*, there was ample evidence in the record that Father "deliberately dragged his feet" with respect to the terms of the Custody Order. 199 Md. App. at 433.

While the court's failure to use the word "willful" in finding contempt does not, by

26

itself, "rebut th[e] presumption" that the judge knew the law and applied it properly, the court's ruling contains "evidence that the court did not know or apply" the correct standard for finding contempt. *Bahena*, 164 Md. App. at 288. Thus, although the court articulated what may otherwise be a sufficient basis for finding Father in contempt, the court's express application of an incorrect legal standard renders that finding an abuse of discretion.

## III.

## SANCTIONS AND PURGE PROVISIONS

### A. Parties' Contentions

Father argues that the circuit court erred in "imposing incarceration as a sanction" in the Contempt Order and "placing a purge condition on [Father] that was beyond his present ability to comply with." He avers that "restrictions arising from [an] ongoing criminal case . . . precluded him from" complying with the court's order by transferring A. to Mother's custody personally, and that he had "no control over the actions of third parties who might have facilitated the transfer." Furthermore, Father contends, the Contempt Order adds conditions that were not part of the original Custody Order, including not being able to reside at his current residence if A. returned there. According to Father, these new conditions "undermine[] the very nature of civil contempt, which is intended to address noncompliance with the terms of the existing order[,]" rather than to "expand[] the scope" of the defendant's obligations. Father also argues that the Contempt Order's provisions implementing the sanction of incarceration, "without affording [Father] the opportunity for a full adversary hearing," led to the "violation of [his] due process rights" and constitute a "punitive measure without proper procedural safeguards."

27

Mother responds by highlighting that the purge provision "allow[s] [Father] the opportunity to avoid the sanction by . . . arranging for [A.] to be dropped off at [the marital home] at 4:00 pm on Monday, September 9, 2024[,]" and defers sentencing "from September 6 until (at least) September 10." Father would not have incurred any jail time had he ensured A. was dropped off at the marital home by the deadline set in the court's Contempt Order, and therefore, Mother urges, the sanction is properly coercive. Mother asserts that "there were a number of ways [Father] could transfer [A.] . . . without violating any provision" of the protective order, and that this concern was "raised and addressed during the September 6th hearing" by her counsel.

Mother insists that the Contempt Order does not add any "new obligation(s) which were not present in the original June 13th Custody Order," contrary to Father's contentions. To the extent that the Contempt Order renders Father "unable to reside at his current residence if [A.] returns," Mother argues that this was already "an implicit requirement of nearly every court order related to this case since the . . . Custody Order[,]" and points out that under the Custody Order, Father cannot "communicate with [A.] outside of the supervised visitation" he is entitled to under that order, "by any means verbally or by written correspondence . . . or any other electronic means, either directly or indirectly through third parties."

### B.  Legal Framework

Unlike criminal contempt, which "serves a punitive function," civil contempt "is remedial or compulsory and must provide for purging." *Usiak v. State*, 413 Md. 384, 395 (2010) (quoting *Smith v. State*, 382 Md. 329, 338 (2004)). "[T]he purpose of civil contempt

28

is to coerce present or future compliance with a court order, whereas imposing a sanction for past misconduct is the function of criminal contempt." *Breona C.*, 253 Md. App. at 73 (quoting *Dodson*, 380 Md. at 448). The Supreme Court of Maryland has observed that

> [s]anctions for contempt ordinarily fall into three general categories: (1) determinate sanctions, which are criminal sanctions, such as a jail sentence of one year; (2) coercive sanctions, which are civil sanctions, such as imprisonment until the contemnor complies with an order of the court or a fine to be applied until the contemnor complies; and (3) remedial sanctions, such as a civil fine payable to the plaintiff to compensate the plaintiff for losses suffered as a result of the contemnor's non-compliance.

*Jones v. State*, 351 Md. 264, 278 (1998).

"'[R]emedial' in this context means to coerce compliance with court orders for the benefit of a private party or to issue ancillary orders for the purpose of facilitating compliance[.]" *Dodson*, 380 Md. at 448. As such, "normally in a constructive civil contempt action there cannot even be a finding or adjudication that the defendant is in contempt unless the defendant has the *present* ability to comply with the earlier court order or with the purging provision." *Id.* at 450. If an order that imposes a sanction on a civil contemnor does not contain a purge provision with which the contemnor has the ability to comply, then "[t]he sanction partakes of a criminal sentence" and is inappropriate in the civil contempt context. *Jones*, 351 Md. at 281-82. As summarized in *Breona C.*,

> an order holding a person in constructive civil contempt is not valid unless it: (1) imposes a sanction; (2) includes a purge provision that gives the contemnor the opportunity to avoid the sanction by taking a definite, specific action of which the contemnor is reasonably capable; and (3) is designed to coerce the contemnor's future compliance with a valid legal requirement rather than to punish the contemnor for past, completed conduct.

253 Md. App. at 74.

Because incarceration obviously impinges upon the contemnor's liberty interests protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights, "both the form and substance of due process and proper judicial procedure must be observed" when imposing it as a sanction for contempt.[14] *Thrower v. State ex rel. Bureau of Support Enf't*, 358 Md. 146, 161 (2000). Indeed, the United States Supreme Court instructed nearly 60 years ago that a court's justification for imposing imprisonment as a sanction in a civil proceeding "depends upon the ability of the contemnor to comply with the court's order." *Shillitani v. United States*, 384 U.S. 364, 371 (1966). As Justice Breyer explained in *Turner v. Rogers*, 564 U.S. 431 (2011), "[t]he interest in securing . . . freedom from bodily restraint[] lies at the core of the liberty protected by the Due Process Clause" and accordingly, "its threatened loss through legal proceedings demands due process protection." 564 U.S. at 445 (internal quotations omitted).

In *Jones*, the Supreme Court of Maryland ruled that "a determinate sentence of two years in jail, suspended on condition that the contemnor obey a court order[,]" could not

---

[14] The Supreme Court of Maryland has held that in civil contempt proceedings involving indigent defendants, "the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights" require that the defendant be "afforded the right to appointed counsel" before the court may sentence them to incarceration. *Rutherford v. Rutherford*, 296 Md. 347, 363 (1983). "This does not mean that a constitutional right to appointed counsel attaches in every civil contempt proceeding"; rather, "it is the fact of incarceration, and not the label placed upon the proceeding, which requires the appointment of counsel for indigents." *Id.* at 361-63. A heightened concern for due process is implicated in all proceedings where incarceration is threatened, regardless of whether the proceeding is designated as "civil" or "criminal." *Id.* at 361.

be imposed as a sanction for constructive civil contempt. 351 Md. at 278. The Court observed that although this sanction "when first imposed certainly was coercive," because the contemnor could avoid serving it at all by complying with the court's order, "upon non-compliance, the sentence was a determinate one, lacking any purge provision." *Id.* at 279. Without a "provision in the order which would make the time to be served in jail contingent on any future conduct[,]" such as compliance with the court order after the period of incarceration began, the sanction became punitive, rather than coercive, after the contemnor started serving the prison sentence. *Id.* at 282.

In *Arrington v. Dep't of Human Resources*, 402 Md. 79 (2007), the Supreme Court further clarified that the court's determination as to whether the contemnor "has the current ability to meet the purge" must be made "contemporaneous[ly] with when the incarceration is to commence[,]" and the contemnor's ability to purge contempt "must remain in existence throughout the period of incarceration." *Id.* at 101. In other words, the contemnor "must have the ability to avoid both the commencement and the continuation of incarceration." *Id.*; *see also Bradford v. State*, 199 Md. App. 175, 202 (2011) (holding that a 60-day sentence of incarceration for contempt of support order is a "determinate sentence without a post-confinement purge provision, a sentence reserved for criminal contempt proceedings").

## C. Analysis

Applying the foregoing principles, we hold that the circuit court erred by: (1) imposing a determinate sentence of "thirty (30) days of incarceration" in a civil contempt order, without providing for Father's ability to end the sentence by purging; (2) improperly

31

modifying the Custody Order's assignment of custody by prohibiting Father from having any contact with A. for 60 days; and (3) providing for Father's incarceration based only upon the filing of a line by Mother's counsel or the BIA, without affording Father a hearing or judicial determination of whether he had failed to comply with the Contempt Order.

At the outset, we note that we are not persuaded by Father's argument that he could not comply with the Contempt Order's purge provision at the time of its entry. In reviewing a constructive civil contempt order, we will not overturn a court's factual findings unless they are clearly erroneous. *Kowalczyk v. Bresler*, 231 Md. App. 203, 209 (2016). In its oral ruling, the circuit court found that it was well within Father's power to make arrangements for A. to be brought to the marital home. The court noted that Father had "figured out" how to do so "a number of times" in the past, and that it was "within his ability" to do so again, per the terms of the Contempt Order. Although Father contends that the court "disregarded" his claim that he "had no control over the actions of third parties who might have facilitated the transfer[,]" the transcript of the September 6, 2024 show cause hearing shows that the court explicitly addressed these concerns and rejected them based on ample evidence from the record documenting Father's ability to facilitate a transfer without violating any protective orders. Therefore, we see no clear error in the court's finding that Father had the ability to comply with the purge provision at the time the Contempt Order was entered.

Despite Father's ability to comply with the purge provision at the time of its entry, the Contempt Order is deeply problematic in several other respects. The circuit court imposed a 30-day sentence of incarceration, deferred until September 10, 2024, as a

32

sanction for Father's contempt of the Custody Order. In order to purge and avoid jail time, Father was to arrange for A. "to be dropped off at [the marital home] at 4:00 pm on Monday, September 9, 2024." As in *Jones*, 351 Md. at 279, this sanction "when first imposed certainly was coercive," because it encourages Father to facilitate the transfer so that the 30-day sentence never goes into effect. But if Father fails to make the transfer on the date and time specified, there is no "provision in the order which would make the time to be served in jail contingent on any future conduct[.]" *Id.* at 282. There is no incentive for Father to facilitate a transfer after September 9. Without "a post-confinement purge provision," incarceration has no coercive effect. *Bradford*, 199 Md. App. at 202. The Contempt Order's sanction is therefore a punitive measure "reserved for criminal contempt proceedings[,]" and it was error for the court to impose it here. *Id.*

The Contempt Order also provides that beginning September 9, 2024, Father cannot have any contact with A. for 60 days and must leave his parents' house if A. shows up there. This obligation is inconsistent with the Custody Order, under which Father is entitled to supervised visitation with A. every other Saturday. Although circuit courts can "issue ancillary orders for the purpose of facilitating compliance or encouraging a greater degree of compliance with court orders" in contempt proceedings, *Dodson*, 380 Md. at 448, they cannot issue orders that effectively modify a prior custody determination without undertaking the same "procedural analysis" required in any other custody modification. *Kowalczyk*, 231 Md. App. at 213. This analysis must include (1) an assessment of whether there has been a material change in circumstance and, if so, (2) an assessment of the child's best interests. *Caldwell v. Sutton*, 256 Md. App. 230, 270 (2022). Here, while the goal of

33

the 60-day prohibition on contact was clearly to coerce Father into complying with the Custody Order, there is no indication that the circuit court assessed whether "suspending all visitation was not contrary to the best interests of the child." *Kowalczyk*, 231 Md. App. at 214. Accordingly, we conclude that the Contempt Order improperly modifies the Custody Order's assignment of custody between the parties.

Finally, under the terms of the Contempt Order, Father is subject to incarceration without a judicial determination of whether he has purged contempt. The Contempt Order provides that, upon the filing of a line by either Mother's counsel or the BIA alleging that Father violated the 60-day prohibition on contact with A., Father is to report to the circuit court "to be taken into custody and begin serving his period of incarceration." There is no mention of an opportunity for Father to contest the line, nor are the allegations in the line subject to judicial scrutiny. A court must determine that a contemnor is still in contempt and still has the present ability to purge before the contemnor can be incarcerated. *See Arrington*, 402 Md. at 101 (court must "determine whether the [alleged contemnor] has the current ability to meet the purge" before imposing incarceration). Where incarceration is imposed as a sanction in a constructive civil contempt proceeding, "both the form and substance of due process and proper judicial procedure must be observed." *Thrower*, 358 Md. at 161. This is particularly important "because a person's liberty is at stake[.]" *Id.* Any "[s]hortcuts that trample on these requisites[,]" such as the imposition of incarceration based merely on one party's unproven allegation that a contemnor has not purged contempt, "are not allowed." *Id.*

34

## D. Summary

From the foregoing, we summarize certain requisites for issuing an order of constructive civil contempt based on an alleged contemnor's violation of a custody order:

1. Before finding an alleged contemnor in constructive civil contempt of a custody order, the court must determine, by a preponderance of the evidence, that the alleged contemnor willfully violated that order. While the court's use of the word "willful" is not required under our precedent, the court must make clear that it recognizes that willfulness is necessary to find an individual in contempt of a custody order.[15]

2. The court must also find that the alleged contemnor has, as of the time of the contempt finding, the present ability to comply with the custody order.

3. To impose incarceration as a sanction, the court must craft a purge provision that permits the contemnor to end the incarceration at any time by purging. Determinate sentences without a purge provision – such as the 30-day sentence imposed in the instant case – are not permissible.

4. To impose incarceration as a sanction, the court must judicially determine that the contemnor (1) is still in contempt and (2) still has the present ability to comply with the custody order or purge provision "at the time the sentence actually may be executed[.]" *Jones*, 351 Md. at 279.

5. The court cannot use a contempt proceeding to modify the custody determination in the custody order without undertaking the analysis required in a custody modification proceeding. If the court does not intend to modify custody, it must craft the obligations of the contempt order carefully to avoid contradicting any preexisting custody determination.

---

[15] As noted above, Rule 15-207(e) modified the standard for finding contempt in constructive civil contempt cases based on the failure to comply with a child support order. However, in such cases, incarceration still may not be imposed unless the court determines that the contemnor has the present ability to purge contempt.

# IV.

## COMPENSATORY DAMAGES

### A. Parties' Contentions

Father challenges the circuit court's award of $9,600 "as a contribution to costs and expenses incurred by [Mother] in connection with [his] non-compliance with the court's orders[.]" Father claims that the circuit court's award constituted improper "compensatory damages," which "may never be recovered in a civil contempt action based upon a past negligent act by the defendant[,]" quoting *Dodson*, 380 Md. at 454. He argues that the circuit court "failed to identify any exceptional circumstances or make a determination that [he] willfully violated the June 14, 2024, Court Order" and instead "merely concluded" that he "could have done more." Father further claims that because the "June 14, 2024 Order provided that [Mother] would bear the cost of expenses associated with her efforts to effectuate the transfer of [A.,]" the court's compensatory damages award "essentially shifted a financial burden to [him]," and "impermissibly modified the original order without legal basis and in contravention to Maryland law."

Mother responds that during the August 9 hearing, the circuit court stated that, though this is a civil contempt action, "this is a proceeding involving custody and efforts to obtain custody, and there is a provision in the Family Law Article which authorizes an award in cases in which those are at issue." Mother posits that the provision the court referred to is Maryland Code (1984, 2019 Repl. Vol.) Family Law Article ("FL") § 9-105, which provides for the assessment of "costs or counsel fees" in a "custody or visitation proceeding" against a party who "has unjustifiably denied or interfered with visitation

36

granted by a custody or visitation order." Ultimately, Mother asserts that the circuit court had "the discretion to award costs" and that it was "appropriate and just" to provide a compensatory damages award in this case, particularly given Father's "repeated and willful noncompliance with multiple court orders."

## B. Legal Framework

In civil contempt proceedings, a court may impose "remedial sanctions, such as a civil fine payable to the plaintiff to compensate the plaintiff for losses suffered as a result of the contemnor's non-compliance." *Jones*, 351 Md. at 278. As we explained above, "remedial" in the civil contempt context means "to coerce compliance with court orders for the benefit of a private party or to issue ancillary orders for the purpose of facilitating compliance[.]" *Dodson*, 380 Md. at 448; *see also Gertz v. Md. Dep't of Env't.*, 199 Md. App. 413, 423 (2011) ("[A] civil contempt order is 'remedial in nature' in the sense that it is 'intended to coerce future compliance' with court orders[.]" (quoting *Dodson*, 380 Md. at 448)). "Because of the remedial purpose of civil contempt, '[t]he sanction imposed for civil contempt . . . must allow for purging.'" *Royal Investment Group, LLC v. Wang*, 183 Md. App. 406, 447 (2008) (alterations in original) (quoting *In re Ann M.*, 309 Md. 564, 569 (1987)).

A compensatory damages award for *past* loss is deemed punitive and is typically impermissible in the civil contempt context. *See Dodson*, 380 Md. at 446 ("[A]n award of compensatory damages is ordinarily inconsistent with the nature of a constructive civil contempt action under Maryland law."). Such an award typically does not "coerce compliance with court orders[,]" but rather serves as a "sanction for past misconduct[,]"

37

which is "the function of criminal contempt." *Id.* at 448. Compensatory damages are inappropriate in civil contempt cases except "under exceptional circumstances," where "a willful violation of a court order[ ] clearly and directly caus[ed] the plaintiff a monetary loss[.]" *Id.*[16]

In *Royal Investment Group, LLC v. Wang*, we found "exceptional circumstances" warranting a compensatory damages award in a civil contempt case. 138 Md. App. at 452-53. In *Wang*, a seller and a buyer engaged in protracted negotiations over a condemned residential property. *Id.* at 418-23. The buyer sued the seller to enforce a purported agreement between the parties, and the seller filed a counterclaim, alleging the buyer's trespass on his property. *Id.* at 425-26. After a bench trial, the circuit court ruled in favor of the seller on the trespass issue and granted possession to him. *Id.* at 426. Despite this ruling, the buyer and a crew of workers entered the house and removed cabinetry worth $75,000. *Id.* at 428-29. The seller filed a petition to hold the buyer in contempt of court, seeking damages for the removed cabinets. *Id.* The court found the buyer in contempt and imposed a sanction of incarceration, with payment to the seller for the removed cabinets as a purge provision. *Id.* On appeal, we reasoned that the buyer's conduct was "egregious"

---

[16] In *Dodson*, the Supreme Court of Maryland observed that decisions in other jurisdictions are in conflict over whether a compensatory damages award is permissible in a civil contempt case. 380 Md. at 445 n.1 (listing cases). Later, in *Wang*, we expressed that "Maryland should join the 'clear majority of state courts' that permit, in appropriate circumstances, a monetary sanction in a civil contempt proceeding to compensate for damages caused by the contemnor." 183 Md. App. at 454. Nonetheless, we acknowledged that, under Maryland law, compensatory damages awards in civil contempt cases remain "subject to the limitations set forth in *Dodson*" and are allowed only "under exceptional circumstances[.]" *Id.* at 455 (internal quotations omitted).

and directly caused a monetary loss to the seller. *Id.* at 455. We also highlighted that the seller having "already endured" "protracted litigation" constituted exceptional circumstances. *Id.* at 456.

## C. Analysis

Because this case does not present the "exceptional circumstances" that warrant "a monetary award in a civil contempt case[,]" we hold that the circuit court erred in awarding Mother compensatory damages. *Dodson*, 380 Md. at 454. We explain.

We acknowledge that Father's conduct was arguably more "egregious" than the buyer's actions in *Wang*, where the buyer defied a court order on one particular occasion. Here, Father essentially defied the Custody Order on a continuous basis from June 13, 2024 until the show cause hearing on September 6, forcing Mother to engage in "protracted litigation" to enforce the Custody Order. Contrary to the circumstances in *Wang*, however, Father's actions did not clearly cause Mother to suffer a monetary loss. *See* 183 Md. App. at 455. The Custody Order provided that Mother would "bear the cost of" retaining any "professionals" to help facilitate the transfer of A. to her custody. The circuit court erroneously awarded Mother $9,600 for the "costs" of hiring Dr. Jones and SVI after finding that, instead of "cooperat[ing]" with the individual from SVI who arrived at his parents' house to collect A., Father "participat[ed] in [a] confrontation" with him that turned physical, and the transfer was not accomplished. Unlike in *Wang*, where the seller incurred a $75,000 loss only because of the buyer's actions, Mother was responsible for the $9,600 cost of professional assistance regardless of whether Father helped facilitate the transfer of custody. Father's actions, though egregious, could not have caused Mother to

39

incur a financial loss where the only "loss" complained of was an expense already allocated to her by the Custody Order. Accordingly, we must vacate the court's compensatory damages award of $9,600 to Mother.

## V.

## ATTORNEYS' FEES

### A. Parties' Contentions

Father cites this Court's opinion in *Bahena v. Foster*, 164 Md. App. 275 (2005), for the proposition that attorneys' fees are not recoverable in constructive civil contempt proceedings. He notes that the court "appeared to loosely associate the proceedings with a custody action" to support its award of attorneys' fees but insists that there is no "statutory or rule-based provision allowing the recovery of attorneys' fees" in constructive civil contempt proceedings. Father argues that awarding attorneys' fees "improperly shift[ed] the purpose of the contempt proceeding from a coercive mechanism aimed at ensuring compliance with a court order to a punitive measure."

Mother's counterargument is that FL § 9-105 "not only allows for the award of costs in cases involving child custody" but also "explicitly allows for the award of attorneys' fees." Mother also insists that, "whether such fees are recoverable in any particular case is within the discretion of the [c]ircuit [c]ourt."

### B. Analysis

Maryland adheres to the "American Rule," under which "attorney[s'] fees are not recoverable 'in the absence of agreement, rule, statutory provision or limited case law exception[.]'" *Poole v. Bureau of Support Enf't*, 238 Md. App. 281, 294 (2018) (quoting

40

*Bahena*, 164 Md. App. at 288-89). When the court identifies a statutory basis for awarding attorneys' fees, it must base its award "upon the statutory criteria and the facts of the case." *McDermott v. Dougherty*, 385 Md. 320, 433 (2005) (quoting *Jackson v. Jackson*, 272 Md. 107, 112 (1974)). This Court has overturned awards of attorneys' fees where the record does not indicate that the circuit court considered the requirements of the applicable statute. *See, e.g.*, *Gillespie v. Gillespie*, 206 Md. App. 146, 179 (2012) (vacating award of attorneys' fees where there was "no indication that the court expressly considered any of the factors listed in FL § 12-103(b)").

> The court made the following remarks during the August 9 show cause hearing:

> I am, I will say, satisfied that the law permits me to assess or **award attorney[s'] fees and costs**, and I will seriously consider that at the next hearing, because this is a proceeding involving custody and efforts to obtain custody, and **there is a provision in the Family Law Article which authorizes an award in cases in which those are at issue.**

(Emphasis added). Although the court never clarified which provision of the Family Law Article it was referring to, its ruling suggests that the award of attorneys' fees was based on FL § 12-103:

> As far as fees go, the [c]ourt has considered the evidence that was presented about [Father's] **recent job and his earnings**. There is no evidence, other than the fact that **he has an outstanding attorney[s'] fees bill** at the current time, there's no other evidence of **his financial situation** that's been presented. So **based on the evidence that is presented** and on the efforts that I find were reasonable to try to gain his compliance with the [c]ourt's orders and his violation of the orders, I find that there was **substantial justification** in bringing the action on the part of [Mother].

The court's references to "substantial justification" and discussion of Father's finances are consistent with language in FL § 12-103(b), and its invocation of "a provision in the Family

41

Law Article which authorizes an award" in "a proceeding involving custody and efforts to obtain custody" is consistent with language in FL § 12-103(a).[17]

The Supreme Court of Maryland instructed in *Davis v. Petito*, 425 Md. 191, 200 (2012), that FL § 12-103 constitutes "an exception to the 'American rule[]'" allowing a court to award attorneys' fees in cases where that statute is applicable. In *Poole*, we held, relying on the plain language of the statute, that FL § 12-103 is applicable in constructive civil contempt actions brought "to recover arrearages of child support" and "to enforce a decree of child support." 238 Md. App. at 294. By parity of reasoning, and in view of the plain language of the statute, FL § 12-103 also applies in constructive civil contempt actions brought "to enforce a decree of custody or visitation."

---

[17] In relevant part, FL § 12-103 states:

(a) The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

> (1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties; or
> (2) files any form of proceeding:
>> (i) to recover arrearages of child support;
>> (ii) to enforce a decree of child support; or
>> (iii) to enforce a decree of custody or visitation.

(b) Before a court may award costs and counsel fees under this section, the court shall consider:

> (1) the financial status of each party;
> (2) the needs of each party; and
> (3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

We conclude that the court's decision to award attorneys' fees under FL § 12-103 was properly based upon the statutory criteria and a consideration of the relevant facts. *McDermott*, 385 Md. at 433. Family Law section 12-103 "contemplates a systematic review of economic indicators in the assessment of the financial status and needs of the parties" and a "review of the substantial justification of each of the parties' positions in the litigation, mitigated by a review of reasonableness of the attorneys' fees." *Petito*, 425 Md. at 206. Under FL § 12-103(b), the court is required to consider "the financial status of each party," "the needs of each party," and "whether there was substantial justification for bringing, maintaining, or defending the proceeding." However, the court need not "specifically recite the statutory factors in its award of attorney[s'] fees" provided the evidence in the record indicates that the court engaged in the requisite analysis. *Meyr v. Meyr*, 195 Md. App. 524, 553 (2010).

The record indicates that the circuit court considered the requisite FL § 12-103(b) factors in awarding attorneys' fees. In its September 6 ruling, the court explicitly found that Mother was substantially justified in bringing this action. Although the court only explicitly mentioned Father's financial status and needs in its ruling, the record reflects that the court considered evidence of both parties' financial statuses and needs in awarding Mother's counsel attorneys' fees.[18] Thus, we conclude that the court considered the

---

[18] In assessing the fees against Father, the court observed that Father's annual income of $175,000 was "not insignificant," even though he owed his attorney "between $44,000 and $45,000." The record also reflects that the court considered evidence that both Mother and Father had incurred substantial expenses as a result of the protracted

(Continued)

43

financial statuses of each party, the needs of each party, and Mother's substantial justification in bringing the action, and that the court therefore did not abuse its discretion in awarding attorneys' fees under FL § 12-103. *McDermott*, 385 Md. at 432-33.

**Conclusion**

We vacate the court's contempt order, except the provision awarding attorneys' fees. If further proceedings against Father for contempt of the Custody Order are still warranted, Mother must initiate those proceedings based on any *current*, ongoing noncompliance with the Custody Order.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED IN PART AND AFFIRMED IN PART; COSTS TO BE PAID BY APPELLEE.**

---

litigation underlying the contempt proceeding. During the August 9 contempt hearing, in addition to requesting attorneys' fees, Mother's counsel requested that child support be reinstated. The child support worksheet that was before the court (record extract at E.131) shows that Mother's monthly income was $600 (without including alimony and child support). Mother also testified that she had to borrow money from her father to pay the costs of the professionals to facilitate the transfer of A. to her custody, and that she did not "have enough money right now to try to" retain the services of SVI or Dr. Camille Jones again. Moreover, the court expressly acknowledged at the August 9 hearing that it was familiar with, and had made findings concerning, both parties' incomes. Thus, although the better course would have been for the court to further explicate the factors that it considered, we are able to conclude from the record that the court considered the necessary FL § 12-103(b) factors in awarding attorneys' fees. *See Meyr*, 195 Md. App. at 553; *Malin v. Mininberg*, 153 Md. App. 358, 435–36 (2003) ("[T]he trial court 'is vested with wide discretion' in deciding whether to award counsel fees and, if so, in what amount." (quoting *Dunlap v. Fiorenza*, 128 Md. App. 357, 365 (1999))).